State *v.* Hargrove.

STATE *v.* WILLIAM HARGROVE.

1. CRIMINAL LAW. *Oath of jury.* Where in the entry reciting the swearing of the jury when empanelled, the oath is, "who being elected, tried and sworn to well and truly try the issue joined," and in the entry containing the verdict after giving the names of the jurymen it is recited, "who being duly empanelled, elected, sworn and charged, well and truly to try the issues joined in this case, and the truth to speak, and a true deliverance on their oaths do say," etc. *Held,* that if the first recital is defective the latter cures it.

2. SAME. *Charge of court.* While it is proper when requested, for the circuit and criminal judges to charge all the grades of offense involved in the indictment, and reprehensible for them to refuse to charge, yet when the Supreme Court can see that the prisoner has not been injured by the failure to charge on all the grades of crime involved in the indictment, a new trial will not be granted.

FROM BENTON.

Appeal in error from the Criminal Court of Benton county. C. ADEN, J.

—— —— FARMER for Hargrove.

ATTORNEY-GENERAL LEA for the State.

FREEMAN, J., delivered the opinion of the court.

The defendant was indicted for killing Alfred Register on November 24, 1881, by shooting him with a pistol. He plead not guilty, and was convicted by a jury of murder in the first degree, the jury finding, however, mitigating circumstances, and the court acting on this, he was sentenced to imprisonment in the penitentiary for life. He has appealed in error to this court.

Several errors are assigned. The material ones we proceed to dispose of.

Objection is taken to the form of the oath administered to the jury. In the entry reciting the swearing of the jury, when empanneled, the oath is: "who being elected, tried and sworn to well and truly try the issue joined." But we find in the entry containing the verdict, after giving the names of the jurymen, it is recited, "who having been duly empanneled, elected, sworn and charged well and truly to try the issues joined in this cause, and the truth to speak, and a true deliverance on their oaths do say," etc. If the first recital was defective, the latter recital is full enough to cure the supposed defect. The latter entry is as much a part of the record as the first, and has the same verity, the whole record must be taken to show correctly the history of what occurred on the trial.

The evidence unquestionably sustains the verdict of the jury as to the killing and degree of guilt. It may well be doubted whether there is any thing on

which to base the finding "of mitigating circumstances," unless it be the fact that the defendant was but a youth, probably not more than seventeen years of age at the time.

The facts are, that deceased, who was a brother-in-law of defendant, lived at the house of his father-in-law, or was staying there with his family, in Carroll county. The day before the killing they started to Benton county to rent land. They returned through Camden, the county seat of Benton, on their way home, and about three miles west of that place they seemed to have turned out of the main road, along a blind path that led to the top of a hill, the top being the head of a hollow descending the opposite way from the main road, to feed their mules, each riding one of these animals. The path gave out at top of the hill, the parties went over the top of the hill, as far down the descent as they could well get, stopped, fed the mules on fodder, and evidently had lain down behind the shelter of the hill to rest while the mules fed, the day being a cold one. The testimony would show that the deceased was lying with his feet down the hill, his hat on, a handkerchief partly over his lower face, and around his neck, and probably asleep. The defendant, from the print of his body on the leaves, had laid down by his side, within reach of him, with his head a little higher up the hill than deceased, his body angling from him. In this position he evidently shot the deceased on the top of the head, a little to the right of the center of the head, and a little back from the top; the ball,

says the physician who examined the body, and got it out, ranging a little to the right—the prisoner being to the left of Register. That this is the history of the transaction there can be no doubt. The place was a most retired one; there was no sign of a struggle, nor in fact, as we think, of any violence on the body,. except the pistol shot. The deceased was found a few minutes afterwards lying in the position indicated, his feet crossed, his hat partly on his head, a pistol ball through it, going into his head, his right hand in his pocket, his left extended by his side. He evidently had not moved after the shot.

The two parties who found him, had gone out to hunt sheep, were in the road about 150 yards from the place when the shot was fired. They supposed it was some neighbor hunting, and turned out of the road, and went in direction of the sound, and when they got in twenty or thirty steps of the place defendant was seen near the body, the mules with bits out of their mouths hitched to trees hard by. They asked where his game was? He said his brother-in-law had shot himself; that he was very sorry; he would get whisky in Camden; and that he was going to get a wagon to carry the body on, moving in a hurry to the mules, fixing the bridles, then leading them on towards the road, the two men following and talking to him. He was told Mrs. Watkins lived at next house, about three-fourths of a mile, and had wagon and team he could get. He mounted one mule, drove the other before him, started down the road, going towards home, increasing his speed until he got

into a gallop, and so went out of sight. The parties followed, and found he had not stopped at Watkins nor at next house. He was pursued, found not to be at his father's after night, but was arrested at Huntingdon, Carroll county, that night, a ticket having been procured for Union City, one having been bought for some point in Missouri. He got on the train secretly, after it was in motion, getting into baggage car.

From this summary, it is clear, there is no room for the theory that the case is one where the killing alone is proven, with a deadly weapon, but nothing shown as to the circumstances, in which case the verdict should have been only murder in the second degree, there being no evidence of premeditation and deliberation, the essential elements of the first degree.

The facts show beyond question the murder was done deliberately, and the shot fired with the certain intent it should produce death. The position of the dead man shows there was no altercation, as he lay in an attitude of repose. He was unarmed when found. It is shown by the statement of the prisoner, when he was arrested, that the wound was inflicted by a pistol, not a short one, for prisoner had one of that kind on when arrested, and on being arrested, and on being asked if that was the pistol the man was killed with, said no, it was a longer one. It is almost, if not quite, physically impossible that the party could have shot himself even with a short pistol, lying as he was, as he was shot. The right hand, with which he would have shot, was in his

pocket; it would have been still more difficult with the left hand, unless he was left handed, which is not shown, and besides that hand was extended by his side. The hat being on his head would add to the difficulty of his shooting himself. Other reasons might be given, but this suffices to show that what we have assumed as the facts of the transaction is beyond question.

Evidence is introduced from the sisters and members of the family tending to show several previous threats to kill defendant on the part of deceased. These come in a very questionable shape, and some are incredible. For instance, one sister, Jane Hargrove, swears he got his pistol the morning they started to Benton county, and said he "intended to kill prisoner before he come back, and go to Utah." She says, on cross-examination, that her brother was in the house at the time, and she never told him of it. This is incredible, that a sister, a woman of twenty four years of age, should hear such a threat, and see her young brother start off under such circumstances, and not warn him of his danger. We don't believe it, as the jury evidently have not.

Mary Register, the widow of deceased, and another sister, proved similar threats, and that her husband prevented her telling her brother. It was then proposed to prove that when she spoke of telling him, her husband knocked her down, kicked and abused her, pulling her hair. These acts of violence were not permitted to go to the jury, and exception taken to refusal. While it might not have been error to

have permitted them, we do not think there is any reversible error in refusing to do so. The fact that he prevented her telling was admitted; violence done to his wife because she had proposed to tell her brother would not have served 'to add any thing to the force of the fact in this case. We may add, we think it incredible that such thing occurred at all.

Numerous requests were presented by the defendant's counsel, and court asked to give them to the jury. All were so given except the first and fourth. The fourth was on the subject of reasonable doubt, which the court declined, because sufficiently stated in main charge. In this he was correct.

The first was a request that the court should charge as to the offense of manslaughter, giving the definitions of this offense in both its grades. The court said: "The proposition is technically correct, but I decline to charge the offense of voluntary manslaughter asked, because the court is of the opinion the facts in the case do not raise that proposition of law, and for that reason decline to instruct the jury that the proposition is the law of the case."

If the rule, as stated by the learned judge delivering the opinion of the court in the case of *Good* v. *The State,* 1 Lea, 294, be held applicable to this case, his Honor was correct.

A majority of the court are of opinion the rule referred to is one that ought to be adhered to by this court, and where the court can see the prisoner has not been legally injured by the failure to charge on all the grades of crime involved in the indictment, that such failure is not reversible error. This is the

State *v.* Hargrove.

principle of the *Good* case.   It is, however, as the court holds proper, when requested, that circuit and criminal judges should so charge, and the practice of refusing on the part of such judges is reprehended. It is easily done, and if the facts do not make out a case of lower grade of crime, under clear and proper instructions by the court, no harm is likely to result from what in such a case would be a mere abstract statement of a definition of the other grades of offense included in the indictment.

I am compelled to differ with my brother judges on the last point, deeming the act of 1877 imperative.   The result is the judgment is affirmed.

FREEMAN, J., delivered the following dissenting opinion:

I am unable to assent to the views expressed in the case of *Good* v. *State,* or apply them in this case, though I concede, if the law was not clear that requires the opposite, this would be a proper case for its application.   My reasons are shortly as follows:

Before the passage of the act of 1877, ch. 85, sec. 1, the rule had been settled by the court in more than one case, that the law must be charged in a case of homicide, on all the grades involved in the indictment.

In the case of *Poole & Mahaffey* v. *The State,* 2 Baxt., 294–5, Judge Turney delivering the opinion of the court: "It is also the duty of the court to define in his charge all the offenses included in the

indictment for this crime.   The jury is the exclusive
judge of the facts, the court is a witness to it of the law.
When the jury has heard the facts it is for it to say
what offense, if any, has been committed against the
law.   However plain it may be to the mind of
the court, that one certain offense has been committed
and none other, he must not confine himself in his
charge to that offense.   However clear it may be, the
court should never decide the facts, but must leave
them unembarrassed to the jury."

He then goes on to explain the qualification of the
rule, that is, the court is to charge "on the case
made by the facts," and that this only applies to in-
cidental questions arising on the trial, and says it was
never meant that the court "should be excused from
defining the offenses averred or embraced in the in-
dictment."

The same rule was laid down by Judge McFar-
land in *Little's* case, 6 Baxt., 494.   He says: "We
think the judge erred in declining to instruct the jury
as to the law of manslaughter, the record shows the
judge told the jury that he intentionally omitted to
charge them upon this question.   We have held this
error, after full consideration, in recent cases.   This
is in effect to tell the jury that if the prisoner is
guilty at all, in the opinion of the court, his crime
cannot fall below murder in the second degree.   We
think this invading the province of the jury."   Citing
*Poole & Mahaffey* v. *The State.*

This might not have been the better rule, but we
so held.   There had been, probably, some variation

in the strict application of the rule, though I remember none, but it was, I know, most earnestly combatted by Attorney-General Heiskell.   In 1877 the Legislature passed the act of 1877, as follows: "Be it enacted by the general assembly of the State of Tennessee, that it shall be the duty of all the judges of the State charging juries in cases of criminal prosecutions for any felony, wherein two or more grades or classes of offense may be included in the indictment, to charge the jury as to all of the law of each offense included in the indictment without any request on the part of the defendant so to do."

It is clear, as I think, the intent was to extend the rule to all cases of felony, the court not having applied it except in cases of homicide as in the cases cited.   Be this as it may, the law is the mandate of the Legislature, and imperative.   I might concede the rule had been carried too far by our decisions cited, which were made before the act of 1877, and be ready to qualify them in a clear case like the present.   But I cannot qualify the mandate of the Legislature in terms so plain as not to be misunderstood.   It is the judges "shall charge" in such "cases as to *all* of the law of *each* offense included in the indictment without any request on the part of the defendant so to do."

The rule given in *Good's* case is, that the charge shall be only as to the law as raised, in the judgment of the court by the *facts* on the evidence you have, but to state the two propositions to see that one is the opposite of the other.   I would be willing to modify the rule as laid down by this court, because

I think we could safely apply it in proper cases where we could see the prisoner had been injured by failure of the judge to charge the law as applicable to his case.    But I cannot modify a statute of the State.   It is an unbending thing, and if in accord with the Constitution imperative, and admits of no evasion.

The *Good* case on its facts may not be a very great departure from the statute, as the indictment was for robbery, the bill of exceptions not containing the evidence, but an "agreement conceding the evidence was amply sufficient to warrant the jury in finding the prisoner guilty of the aggravated robbery as charged." The appeal was taken solely to reverse, because notwithstanding this, the court had failed to charge as to the offense of an attempt to commit a robbery.    Let the case stand, if need be, for precisely such a case, as was then before the court, but to go any further is to repeal the statute of the Legislature.   If the law in cases of homicide was as stated before the Legislature made it imperative and extended it to all felonies, I can see no reason why the rule shall be changed because the Legislature has so enacted.

Whatever we may think of the practicability of the rule, it is certainly in accord with the theory of our Constitution and law, that the judge decides the law, the jury the facts, as said by Judges McFarland and Turney in the opinions I have cited, "no matter how clear this may have been to the judge, it was a question for the jury.    If he could decide this in one case,

he could in all cases." I confess it is difficult to find an answer to the meaning. Be this as it may, there is certainly none to the word of the statute, and by this I am bound. If bad policy, the remedy is for the Legislature, not this court.

For these reasons I think the rule in the *Good* case is not the law, and certainly should not be applied to a case of homicide, nor should the judges be allowed to refuse to obey the statute of 1877.