*TARVERS v. STATE.

(*Jackson.*   June 11,   1891.)

90   485
117   372
f117   441

1. MURDER.   *Verdict supported by the evidence.*

This Court affirms judgment condemning defendants to death for murder in first degree upon the facts stated fully in the opinion.

2. SAME.   *Unintentional killing constitutes murder in second degree, when.*

An unintentional killing constitutes murder in second degree, where the death results from a consciously unlawful act, done intentionally and with knowledge on the part of the perpetrator that the act was directly perilous to human life.   There exists, in such case, that high degree of conscious and willful recklessness which evinces the malignity of heart that constitutes malice.

Case cited and approved: Lee v. State, 1 Cold., 66.

3. SAME.   *Error in charge immaterial, when.*

In a murder case, where there are two controverted questions—one of fact, as to whether the killing was intentional or unintentional; and another of law, as to the grade of offense committed if the killing was unintentional—if the jury find that the killing was intentional, upon a charge correct in every respect as regards that theory of the case, this Court would not reverse, if satisfied with the verdict upon the facts, although there should be error in the charge as regards the grade of offense committed upon the theory of unintentional killing.

Cases cited and approved: Williams v. State, 3 Heis., 377; Honeycutt v. State, 8 Bax., 379; Good v. State, 1 Lea, 293; Parham v. State, 10 Lea, 498; State v. Hargrove, 13 Lea, 178.

4. CRIMINAL LAW.   *Arrests by private persons.*

Our statutes, authorizing arrests, in certain cases, to be made by private persons, without warrant, apply alone to public offenses committed within this State and against her laws.   These statutes do not au-

---

*Sentence of death, commuted by the Governor to imprisonment for life.—
REPORTER.

Tarvers *v.* State.

thorize the kidnapping of a citizen of this State by citizens of another State for an offense that he may have committed in that State.

Code construed: §5868 (M. & V.); §5042 (T. & S.).

FROM DYER.

Appeal in error from Circuit Court of Dyer County.   T. J. FLIPPIN, J.

THOMAS E. RICHARDSON for Tarvers.

Attorney-general PICKLE for State.

LURTON, J.   The appellants were jointly indicted for the murder of one Clarence Godale, in Lake County, in April, 1889.   Upon their application the venue was changed to Dyer County, where, upon trial, they were found guilty of murder in the first degree, without mitigating circumstances, and sentenced to death.

The facts antecedent to the killing were substantially these:   The deceased lived in Lake County, upon the farm of James Harris.   The appellants lived in Fulton County, Kentucky, on what is known as Chute No. 8 of the Mississippi River.   Fulton adjoins Lake County, Tennessee.   On Friday before the death of Godale on Tuesday, and in the latter part of April, 1889, the deceased

went to where the appellants were at work in a field and said he was looking for work, and had heard that a man running a mill across the chute and on Island No. 8 wanted a man, and stated that he wished to borrow a skiff to cross to the island. He was told by Nathan Tarver that he had no skiff fit for use, but that a neighbor, James Patterson, had given him the use of his skiff, and that if he would return it in a reasonable time he, Godale, might use it. Deceased, promising to return it within three hours, was permitted the use of Patterson's boat. It was not brought back as was agreed, and on the Sunday following Patterson complained of its loss, and was told by the Tarvers of the circumstances under which Godale had obtained it. They at the same time agreed to go in search of Godale the next day. The next morning the Tarvers learned that Godale had been on Island No. 8, and had gone down the river in the skiff. Nathan Tarver then went before a Justice of Fulton County and made affidavit that Godale had stolen the skiff. A warrant was thereupon issued for the arrest of deceased upon this charge of larceny, and delivered to Nathan. This was in terms addressed to any Sheriff, Constable, Coroner, Jailer, Marshal, or policeman in the State of Kentucky, and commanded any such officer to arrest Godale and take him before any Magistrate of Fulton County, to be dealt with according to law. The appellants then mounted and armed themselves and started in search of the de-

ceased. Neither of them were officers of the State of Kentucky. Not finding Godale or the skiff within the county and State of their residence, they' crossed the border into the State of Tennessee. They say that when they crossed the line and came within this State that they went to a Mr. Darnell, an attorney, living in Lake County, for the purpose of advising with him as to the pursuit of deceased; that they showed him the Kentucky warrant, and that he advised them that they "might pursue Godale, and, if we found him, make him pull the skiff back to Kentucky and turn him over to the Kentucky authorities," but that if he resisted arrest they could not arrest him, but would have to have him arrested by the Sheriff of Lake County. Leaving Darnell—who was not on the trial examined as a witness—they proceeded down the river to Tiptonville.

So far we have followed the narratives as given by appellants upon the witness-stand. From a point one mile north of Tiptonville we are able to trace them through the testimony of others. At the point indicated, and upon Monday—the day before the killing, and the day of their departure in search of Godale—they were met by W. T. Simmons, who rode with them for a short distance in the direction of Tiptonville. They told this witness that Godale had stolen a skiff from them. In response to an opinion expressed by Simmons that if Godale saw them he would give them "the slip or dodge," they replied "if they got

sight of him he would never steal another skiff."

They were next seen by John Williams, who was asked about Godale. To him they said that "he had borrowed a skiff from them, and when they caught him they would kill the d—d son of a b—h."

They next saw a Mr. Bellew, the village blacksmith, who had known them for some years. They asked about Godale, and as to where he lived, and learned from this witness that he lived on the Glass farm, six or seven miles from and south of Tiptonville. To him they said that Godale "had borrowed a skiff from them, and had failed to bring it back; * * * when they caught up with him that they would kill him;" or that "if he did not give an account of the skiff they would kill him."

On the same evening, and about sundown, and in same village, they said to a Mr. Farrar that Godale had stolen their skiff, "and if we find him he won't steal any more skiffs."

Afterward, as they were riding out of and south of the town, they were again seen by Farrar, who, observing that they were armed with guns, said to them, "You seem to be fixed, and you are going to take him in, are you?" to which they replied, "If we catch him he will never steal another skiff." This witness says this was said in rather a jocular manner.

One of appellants was mounted on a mule, the

other on a horse.    Each was armed with a shot-
gun.    From their own statements, we learn that
they stayed that night between Tiptonville and the
home of Godale, at the house of one Malady.
What was said or done there is not shown.    The
next morning they rode up to the gate of the
witness, Robert Gray, who lived within one mile
of deceased.    They obtained from this witness di-
rections as to the way.    They did not state to
Gray any thing as to their purpose.    One hour
after leaving Gray's in the direction of Godale's,
witness saw them riding back past his house in a
lope.    Half an hour after seeing them this second
time, he heard that Godale had been killed.    They
saw on the same morning, and before the killing,
the witness, McIntosh, and asked him to describe
Godale's house particularly.    Witness told them
Godale was not at home.    They replied, "Yes he
is; the d—d s—n of a b—h came home yester-
day."    They seemed very mad, and witness said
no more than to describe Godale's house.    Half
an hour afterward witness heard of Godale's mur-
der.    They next met Witness Defoe, who lived
within six hundred yards of Godale.    They again
asked about deceased, and were told that he, wit-
ness, had met him going down a lane with an ax
on his shoulder.    They left witness, going in the
direction witness had seen Godale.    They stated
to Defoe that Godale had stolen their skiff, and
"that if they found him, he would be pretty apt
to return it."

The dead body of Godale was found in the lane down which appellants had gone in search of him. He had been shot to death. Shot-wounds were found on left breast and on under side of left arm, indicating that this arm had been uplifted at the time a charge of shot had been fired into his left breast and shoulder. The wounds had been made by gunshot, in size two or three numbers under buckshot. His ax was found over the fence opposite his body, blade in the ground and handle sticking up as if thrown over the fence. It had rained the night before, and Godale's tracks were plainly visible in the mud, showing just where he, going north, had met appellants in the lane as they were riding south. Twenty yards north of where the tracks of Godale stopped, and from where his body lay, were the tracks of a mule and horse, which had at that point turned to the right and gone back out the lane in the direction from which the tracks had come. In the fence, on a line with the body and these horse-tracks, were found a number of shot, showing them to have been part of the fatal discharge, and to have come from one of the mounted men. There is no proof of horse or human tracks between the body of deceased and the point where the horse-tracks appeared to have turned back out the lane. The retreating horse-tracks were at once followed, and at a point some miles distant the animals which had been ridden by the Tarvers, were found abandoned in the woods. The pursuit showed that an effort

had been made to return to Kentucky by passing
between Reelfoot Lake and the road which passes
through Tiptonville. In the flight a point had
been reached where a wire fence in front and the
lake on the east prevented further progress without
abandoning the horses. In their panic they had
left their horses and continued the flight on foot.
The next day the appellants were arrested at their
home in Kentucky and brought back to this State
for trial.

Appellants were examined as witnesses in
their own behalf. They admitted the killing of
Godale, but assert that it was accidental. They
say that they had no other purpose in pursuing
deceased than to disarm and arrest him; that for
this purpose they halted him in the lane and
ordered him to throw the ax over the fence and
hold up his arms; that this order had to be
repeated three times before he complied; that to
compel obedience Nathan Tarver drew his gun on
him and cocked it; that when he did throw the
ax away and hold his hands up, that Woodville
Tarver hitched his mule to the fence and dis-
mounted, and, under direction of Nathan, started
toward the deceased with the purpose of searching
him to see if he was armed; that Woodville had
gone half - way between Nathan, who remained
mounted, and who was holding his cocked gun
bearing on deceased, when Woodville's mule jostled
Nathan's horse, causing the cocked gun to be dis-
charged. There was no evidence to support this

theory of an accidental discharge other than their own testimony. No tracks were shown indicating that either animal had left the middle of the road or been hitched to the fence. There is no proof of tracks between the spot where the horse-tracks turned back and the body of Godale. The ground was wet and soft, and the lane examined for tracks very soon after the homicide, and the affirmative proof as to the tracks noticed seem to discredit the story of Woodville dismounting and going toward deceased on the ground.

The repeated declarations made by appellants while in pursuit of Godale, that they would kill him, or that he would never steal another skiff, are in antagonism with the idea that they intended no personal violence. They admit that they had been advised that if deceased resisted they had no right to arrest him. Yet, with this knowledge, they are not heard to say any thing about arresting him, though they talked to as many as seven persons concerning their pursuit of him. They made no communication to any Tennessee officer, and though they passed through the county town of Lake County, yet they are not shown to have asked for legal assistance, or inquired for a public officer. In their own proof they do not claim to have informed the deceased that they proposed to arrest him, or that he was charged with any crime. The absence of any effort to secure an officer, and of all declarations either to deceased or others of any purpose to arrest, are most sig-

nificant, and add weight to their threats of revenge and death as testified to by Bellew and others.

The appellants deny the statements most injurious. Some effort is made to show that two of these witnesses were not where they say they were when these statements were made to them. The character of none of them has been attacked. The effort to impeach them otherwise appears to merit slight consideration. These witnesses had no interest in the case other than that of every good citizen who desired to see crime punished and the law avenged. The conflict between themselves and appellants has been submitted to a disinterested jury, along with the accidental theory of the shooting set up in testimony of appellants. This jury, by a verdict of murder in the first degree, have found against the truth of the statements of appellants. The record abundantly supports this finding, and we cannot disturb the judgment upon the facts as presented by this transcript. The theory of accidental shooting being discredited, the case presented is one in which a helpless and disarmed man, as shown by the position of his ax, standing with arms upraised in token of surrender, as shown by shot-wounds on under side of left arm, has been mercilessly shot to death. This result was premeditated, if we are to believe the threats of death proven by more than one credible witness.

Some criticism has been made upon the charge of the learned Circuit Judge.

The definition of the various grades of crime

embraced within an indictment for murder in the first degree was full and technically exact. The charge upon the subject of reasonable doubt is full and sound and not subject to any criticism. It is, however, urged that the Circuit Judge erred in this: That he stated the defendants' theory of an accidental shooting, and instructed the jury that the facts as stated by the defendants, if believed to be true, would constitute murder in the second degree. It is now insisted that defendants were only guilty of involuntary manslaughter, if their evidence was credible. Upon this subject the trial Judge said: "The defendants in this case do not deny the killing, but claim that it was accidental. They insist that they had a warrant in their hands issued by some Justice of the Peace of Fulton County, Kentucky, authorizing the arrest of the deceased upon a charge of larceny, and that in pursuance of that authority, in attempting to make the arrest of the deceased, he was unintentionally killed. The warrant, as produced in evidence, gave no authority to these defendants to attempt arrests in this State. It is confined to the State of Kentucky, and only authorizes officers in that State to make the arrest in that State, and, by its terms, would be no authority to these defendants, even in the State of Kentucky, to arrest the deceased; and an attempt to make an arrest in this State under the authority produced—that is, the warrant read—was wholly unauthorized and illegal, and conferred no more authority than if they had

no paper whatever. If you find, therefore, from the proof that these defendants armed themselves with shot-guns and went in search of the deceased in Lake County, Tennessee, and when they met him they presented their loaded guns pointed at him and ready to fire, and the gun was accidentally discharged, the defendants would be guilty of murder in the second degree. The doctrine is clear that all acts done intentionally and without legal excuse, whereby the life of a human being is directly put in jeopardy, subjects the wrong-doer to the charge of murder if life flows away unintended."

There is no error in this. We understand by it that if the act done was an unlawful act, and the doing of it was directly perilous to human life, and so known to the wrong-doer, that then there is implied such a high degree of conscious and willful recklessness as to amount to that malignity of heart constituting malice. The result may not have been intended, yet the deliberate and conscious doing of an act the probable consequence of which was death, amounts to murder at common law. This is the doctrine of *Lee* v. *State*, 1 Cold., 66, and it is fully supported by the common law authorities.

"It is not necessary, in order to render the killing murder, that the unlawful act intended would, had it been effected, have been a felony. Thus, in the case of a person who gave medicines to a woman, and of him who put into a woman's

womb skewers with a view in both cases to produce abortion, whereby the women were killed—such acts were clearly held murder, though the original attempt, had it succeeded, would only have been a great misdemeanor; for the acts were, in their nature, malicious and deliberate, and necessarily attended with great danger to the persons on whom they were practiced." Roscoe Crim. Ev., 709.

"If a person ride a horse known to be used to kick amongst a multitude of people, although he only meant to divert himself, and death ensues in consequence, he will, it is said, be guilty of murder; and if a man, knowing that people are passing along the street, throw a stone likely to create a danger, or shoot over the house or wall with intent to do hurt to people, and some one, in consequence, is killed, it is murder, on account of the previous malice, though not directed against any particular individual; for it is no excuse that the party was not bent on mischief generally; but if the act were done incautiously, it would only be manslaughter. In all these cases the nature of the instrument and the manner of using it, as calculated to produce great bodily harm or not, will vary the offense." *Ibid.*, 710.

In regard to the rule where death ensues in the performance of a lawful act; the same author says: "Where death is occasioned by the hand of a party engaged in the performance of a lawful act, it may amount to either murder, manslaughter, or

32—6 P

mere misadventure, according to the circumstances by which it is accompanied. The most usual illustration of this doctrine is the instance of workmen throwing stones and rubbish from a house, in the ordinary course of their business, by which a person underneath happens to be killed. If they deliberately saw the danger, or betrayed consciousness of it, whence a general malignity of heart might be inferred, and yet gave no warning, it will be murder, on account of the gross impropriety of the act. If they did not look out, or not till it was too late, and there was even a small probability of persons passing by, it will be manslaughter. But if it had been in a retired place, where there was no probability of persons passing by, and none had been seen on the spot before, it seems to be no more than accidental death." *Ibid.*, 710.

But upon another ground altogether this charge must be held not to have prejudiced appellants, even if the learned Judge was in error as to the degree of their crime if the killing had been accidental, and under such circumstances as presented by the paragraph of the charge quoted. The jury were distinctly told that if they believed the gun to have been unintentionally discharged, that then the accused would not be guilty of murder in the first degree, but only of murder in the second degree. Upon this charge the jury have returned a verdict of murder in the first degree, which required that they should be satisfied beyond a

reasonable doubt that the killing had been premeditated. The jury have therefore on their oaths returned that the killing was intentional and not accidental.

How, then, can it be material to the accused, under such a verdict, whether a killing unintentional was murder in the second degree or manslaughter? If the verdict had been for murder in the second degree, any error in defining or differentiating that offense from one of lower grade would have been material, and might have been prejudicial, and therefore reversible error. To reverse for an error of law, when the verdict demonstrates that the accused could not possibly have been prejudiced by it, would be a technical folly. *Williams* v. *State*, 3 Heis., 377; *Honeycutt* v. *State*, 8 Bax., 379; *Good* v. *State*, 1 Lea, 293; *Parham* v. *State*, 10 Lea, 498; *State* v. *Hargrove*, 13 Lea, 178; *State* v. *Parham*, 13 Lea, 321.

The Court was requested to charge that without a warrant any private person might lawfully pursue and arrest one whom they had reasonable ground to believe guilty of a felony. The provisions contained in our Code at § 5868 concerning arrests by private persons apply only to crimes committed in this State. The arrest and detention of fugitives from other States is regulated by wholly different provisions. Code (M. & V.), §§ 6190, 6191.

The requests all involved the erroneous idea that citizens of another State could in this State arrest,

without warrant, a citizen of this State for a crime committed in another State, and were properly refused. There is no reversible error in either the charge or refusal to charge. The verdict is well supported by the evidence, and nothing remains but to affirm the judgment and repronounce the sentence of the law upon the verdict.