# H. ROY MULLINS v. THE STATE.*

(*Knoxville*. September Term, 1927.)

Opinion filed November 21, 1927.

1. CRIMINAL LAW. MURDER. PREPONDERANCE OF EVI-
DENCE. ERROR. CHARGE OF COURT.

Where the defendant on trial for murder testified that he did not
know the gun was loaded and denies that he broke the gun,
as was testified by a State's witness, and where it appears that
the .gun automatically became loaded by the manipulation de-
scribed·by the State's witness, and it further appears that the
defendant kept the gun on the premises where the homicide oc-
curred, this court cannot say there is clear preponderance against
the conclusion evidently reached by the jury. (Post, p. 110.)

2. CRIMINAL LAW. EVIDENCE. NEGATIVE TESTIMONY.

Where one witness testifies positively to a fact and other witnesses
testified that they did not observe the particular incident, their
testimony is negative and is not in conflict with the positive
witness. (Post, p. 112.)

3. CRIMINAL LAW. MURDER. CHARGE TO THE JURY.

It is not error for the trial court to charge the jury that the de-
fendant would be guilty of murder in the second degree where
it appears from the testimony that the defendant pursued the de-
ceased, and while the deceased was sitting in an automobile not
attempting or threatening the defendant with harm or violence,
the defendant armed with a shotgun, knowing it to be loaded,
presented it and pointed it at the deceased, ready to fire, or that
he was punching him· with the muzzle of the gun and the gun
was discharged, though accidentally; provided the use of the
gun in so presenting and punching the deceased with the muzzle
was intentional on the part of the defendant and without legal
excuse. (Post, p. 112.)

---

*Homicide by wanton or reckless use of firearm without express
intent to inflict injury, see annotation in 63 L. R. A., 387; 5 A. L. R.,
603; 23 A. L. R., 1554; 13 R. C. L., 860; 5 R. C. L. Supp., 715.

Citing: Lee v. The State, 41 Tenn. (1 Cold.), 66; Tarvers v. The
State, 90 Tenn. (6 Pick.), 485; Shorter v. The State, 147 Tenn. (20
Thomp.), 355; Letner v. The State, 156 Tenn. (1 Smith), 68.

### 4. SAME. GRAND JURY. INDICTMENT.

It is not error for the Circuit Judge to discharge an illegally con-
stituted grand jury and proceed to organize the grand jury by
ordering the sheriff to summon a list of jurors under the Hamblen
County Jury Commission Law. (Post, p. 114.)

Citing: Chapter 552, Acts of 1903.

---

*Headnotes 1. Homicide, 30 C. J., section 560; 2. Homicide, 30 C. J.,
section 651; 3. Grand Juries, 28 C. J., section 6.

---

### FROM HAMBLEN.

---

Appeal from the Circuit Court of Hamblen County.—
HON. H. T. CAMPBELL, Judge.

TAYLOR & BELL and W. N. HICKEY, for plaintiff in error.

W. F. BARRY, JR., Assistant Attorney-General, for de-
fendant in error.

MR. JUSTICE CHAMBLISS delivered the opinion of the
Court.

This appeal is from a conviction of murder in the sec-
ond degree with a sentence of from ten to fifteen years.
It is not questioned that the defendant below killed with
a shot gun the deceased, but the theory of the defense
appears to be that the killing was accidental. The par-
ties to the homicide were both young men, the deceased
between nineteen and twenty, and the defendant four or
five years older. They had lived on adjoining farms and

had been friends prior to the hour of the tragedy. The killing occurred on Sunday morning, just before noon, on the premises of the defendant, following a game of poker in which the defendant and the deceased were engaged in company with some half dozen other young men, and in the course of which there was a good deal of drinking of whiskey, apparently furnished by the defendant, and both of these young men had been drinking to some extent and were more or less under the effect of the liquor. Toward the conclusion of the game, in a room of the house of the defendant, in which the defendant seems to have been the winner, a dispute arose between the defendant and the deceased as to the amount owing by the deceased to the defendant, the deceased insisting that he owed the defendant but $5, and the defendant insisting that he owed him $10.

When this dispute had proceeded for sometime, the defendant became very insistent that he be paid the $10, and the evidence seems to indicate that the defendant came out of the house and into the yard and made some inquiry of certain of the young men present as to who was right about the dispute, to which they refused to respond definitely, not desiring to become involved in the controversy; and he thereupon said, in substance, that he was going back into the house and use physical violence in forcing the deceased to acceed to his demand. It further appears that he entered the room where the deceased was and took out his watch and told deceased that he would give him ten minutes to write him a check, or pay him the money, upon which the deceased told him that it was not necessary to wait the ten minutes and, according to the testimony of the defendant, slapped the the defendant and thus brought on the physical difficulty.

There is some dispute in the record as to which of the two parties actually struck the first blow, but the evidence clearly indicates that they were both willing to fight and proceeded to do so, as the result of which the deceased appears to have gotten rather the advantage. After being separated by mutual friends, the defendant renewed the difficulty once, or perhaps twice, and was finally pushed, or thrown, over against or on a bed in one of the rooms; whereupon the deceased withdrew and left the room and house and started away across the yard, and looking back saw the defendant coming out of the house following him with an automatic hammerless shot gun. The deceased quickened his gait and rapidly moved toward an open Chevrolet car located some hundred and fifty feet from the door of the house from which the defendant had come, and climbed into the right hand front seat of the car and requested Clarence Mc-Corkle, the owner of the car, to take him away, to which McCorkle responded that he was unable to move his car out of the yard at the moment, there being some congestion there. Meanwhile, according to some of the evidence, the defendant followed rapidly and as he proceeded toward the car from the house ''broke'' the gun, looked into it and then snapped it together and proceeded rapidly to the car, going up to the right hand side where the deceased was then sitting.

While the evidence varies as to some of the details, it is shown that the defendant demanded the payment of his $10, and the deceased not responding promptly, struck at him and immediately thrust the gun against the body of the deceased at a point in the side and to the rear, and punched him with it one or more times. The gun fired and the shot entered the body of the deceased fatally wounding him. There is some evidence that after hav-

ing shot the deceased the defendant expressed regret. The wounded man was helped out of the car and laid upon the ground and realizing his wounded condition asked that he be taken to the hospital. Neither McCorkle nor others present volunteered to remove him, indicating that they did not wish to be further involved in the tragedy, and thereupon the defendant got his car and carried the deceased to the hospital in Morristown, several miles away, and there turned him over to the hospital authorities, requesting at the time that his name not be disclosed. The deceased died some hours later, apparently without making any dying declaration.

The record discloses that on his way back home, to which he returned from the hospital, the defendant was accosted by a party who had seen the two men driving toward Morristown shortly before and, in response to an inquiry as to what had occurred, this party testifies that the defendant said "By G— I shot him,"—after explaining that the deceased had been shot in or about the back and that he had carried him to the hospital. The testimony with regard to the use of this oath was attacked and disputed, some evidence being introduced that the witness had told others that the expression used was "My G— I shot him," but the witness stoutly insists that the language was as first quoted. The defendant accounts for his request made at the hospital that his name not be disclosed by saying that he must have been excited and nervous, a natural deduction. On the whole his testimony is frank and includes in effect a confession that he had for sometime been drinking and gambling and otherwise acting improperly and unlawfully, as the result of which he had been frequently arrested at different times and places and for various offenses.

*(1)*  As we read the record, his testimony with regard to the events leading up to the killing, and bringing the case down to the actual firing of the gun is not in material conflict with that of the State's witnesses, with the exception of one very material matter, to which reference has already been made. He insists that he did not know that the gun was loaded and denies that he "broke" the gun and examined it while passing from the house out to the car. It appears that the type of gun used was so constructed that the shells were thrown in position for firing by the manipulation described and that, if the defendant broke the gun as testified to in the record, then he must have known that it was loaded and that by this act he put it in condition for ready firing. This, as indicated, was a vitally material point bearing upon the intent of the defendant in the use of the gun and with respect to this point the jury heard the witnesses and saw their demeanor, and we are unable to say from this record that there is a clear preponderance against the conclusion evidently reached by the jury that the defendant handled the gun as described. Moreover, it is conceded that this shot gun was being kept by the defendant in his bed room at his home for protection, in view of the fact that he was operating a store nearby and necessarily kept more or less money about the premises. It is hardly probable that he would have kept an unloaded gun for the purposes indicated and we think the fair presumption is that he had reason to believe that it was loaded, apart altogether from any examination made of it by him at the moment.

The result is that we cannot escape the evident conclusion reached by the jury that when the defendant presented this gun to the deceased, who had quite evidently withdrawn from their previous conflict without arms, and was seeking to escape, that the defendant knew, or

had every reason to believe, that the gun was loaded and was a deadly weapon. Under these circumstances the case narrows, first, to the question of fact as to whether or not the defendant intended, as he appears to insist, merely to bluff the deceased into paying him $10 instead ·of $5, not intending actually to shoot him, although will- ing to take the chances always incident to the handling of a shot gun in the manner in which it is conceded that it was handled, or whether he purposely pulled the trigger, exasperated by the continued refusal of the deceased to accede to his demands. And, second, to the question of law as to the degree of homicide proper to be found, it being insisted that a verdict of second degree murder is not supported by the evidence.

Just here it may be remarked that in our view the testimony of the defendant himself sufficiently rebuts the theory that he fired the gun under such a state of passion following the fight in the house as to reduce the killing to voluntary manslaughter. Not only from his own testimony, but from the evidence as a whole, we are satisfied that he had no adequate provocation for that degree of passion which would reduce the offense to voluntary manslaughter; moreover, that in fact he did not make the deadly assault in passion under provocation following the fist fight, but had in mind the enforcement of his demand for the payment of the money which he was insisting was due him, although there is ground for the view that the fist fight had aroused feelings of anger and malice operating to induce a purpose to enforce his demand at whatever cost.

Certainly, if he knew, or had reason to believe, that the gun was loaded, his conduct was not excusable homicide, nor involuntary manslaughter. While but one witness appears to have testified directly to having seen the de-

fendant break down the gun, the testimony of this witness is positive and well sustained, despite a vigorous cross-examination; no effort is made to directly impeach him and nothing in his testimony or in the record indicated unfriendliness on his part to the defendant, or partiality for the deceased. *(2)* While it is true that other witnesses did not observe this particular incident, their testimony on that subject is negative only and the conflict in the two accounts in this particular may thus be reconciled. Certain it is, as before suggested, that the circumstances of the possession of the gun do not tend to support the fact that the defendant had any reason to believe that it was not loaded, but rather the contrary. Now with the element of passion under adequate provocation lacking, we are satisfied that the verdict of murder in the second degree is sustained; that the pursuit by the defendant of the deceased in his apparent effort to get away from his antagonist and the scene, and the assault made upon him with this deadly weapon, thrust against his side and handled with utter recklessness and apparent animosity, afforded abundant basis for a finding of malice in fact. *(3)* Under these circumstances we regard it as immaterial to establish that the trigger of the gun was in fact deliberately pulled in inflicting the deadly wound. We are of opinion that the trial Judge correctly charged the jury that, "if you find beyond reasonable doubt that after deceased had retreated from the scene of the trouble between him and the defendant, and had gone to and entered an automobile and was not attempting to do or threatening harm or violence to the person of the defendant, and that thereafter the defendant armed himself with a shotgun and violently went to such automobile, where deceased was sitting at the time, and deliberately presented such shotgun, knowing

it to be loaded, and pointed it at him, ready to fire, or that he was punching him with the muzzle of such gun, in such loaded condition, and the gun was discharged, though accidentally, while thus presenting it at him, or punching him with it, and death resulted from such discharge of the gun, the defendant would be guilty of murder in the second degree; provided that the use of the gun, in presenting it at him and punching him with the muzzle of such gun, was intentional upon the part of the defendant and without legal excuse, this being a question to be determined by the jury from all the facts and circumstances proven in the case, but the deliberate and conscious doing of these acts upon the part of the defendant and the probable consequences of death must be found by the jury, to the exclusion of all reasonable doubt.''

In this connection it is noted that the passage above quoted from the charge of the Court is assigned as error upon the theory that it invaded the province of the jury in its statement of fact. To this we do not agree. The Judge properly left to the jury the determination of the facts set forth as the basis of the law charged. It results from what has been said that we find no preponderance against the verdict of second degree murder.

Complaint of the charge is made in the assignments of error in other particulars than that already dealt with, but upon a careful review of the charge we do not find reversible error therein. Sufficient reference was made to the theory of voluntary manslaughter as well as of involuntary manslaughter, the law applicable to both of these offenses being fully stated. We regard further elaboration in the charge, with special reference to the facts of the case touching the offense of manslaughter, as uncalled for, for reasons already indicated.

156 Tenn.—8.

We do not find it necessary to cite or quote from authorities at length for support of the views hereinbefore expressed with respect to the law of the case. We content ourselves with citation of *Lee* v. *State,* 1 Cold., 66 and *Tarvers* v. *State,* 90 Tenn., (6 Pick.), 485, in which the determinative principle is laid down. In a headnote to the latter case, the opinion being by Mr. Justice LURTON, what we regard as the applicable rule is thus stated: "An unintentional killing constitutes murder in second degree, where the death results from a consciously unlawful act, done intentionally and with knowledge on the part of the perpetrator that the act was directly perilous to human life. There exists, in such case, that high degree of conscious and wilful recklessness which evinces the malignity of heart that constitutes malice." And see opinion of Mr. Justice McKINNEY in *Letner* v. *The State,* 156 Tenn., (3 Smith), 68, and authorities therein reviewed. Also *Shorter* v. *The State,* 147 Tenn., 355.

Complaint is also made of alleged errors in connection with the argument of counsel for the State. It is true that strong language was used, but we are not prepared to say that the situation did not call for the use of strong language, in view of the record which this unfortunate young man had made for himself and which culminated in the scene of lawlessness on this Sunday morning and the unnecessary death of the deceased. Further assignments of error are directed to the action of the trial Judge in organizing the grand jury. (4) A plea in abatement was sustained to the indictment first returned on the ground that the grand jury was selected by an illegally constituted jury commission for Hamblen County. Thereafter the Court proceeded to organize the grand jury by ordering the Sheriff to summon a list of jurors. We find no error in this action of the

trial judge, it being expressly provided by Section 12, Chapter 552, Acts of 1903, providing for a jury commission for Hamblen County, that "if for any reason a legal panel is not furnished a Circuit or Criminal Court at any regular or special term, as provided by this Act, then the Judge of said Court shall have the right to select a panel and such additional jurors as may be needed by this Court during said term of Court."

While the killing of this young man by his former friend and companion is greatly to be regretted, we are unable to see wherein the verdict reached by a jury of his fellow citizens, approved by the trial Judge, is inconsistent with the facts developed, or contrary to the law, and the judgment must be affirmed.