Forsha *v.* State.

(*Nashville,* December Term, 1945.)

Opinion filed March 2, 1946.

Rehearing Denied May 4, 1946.

C. L. BOYD, of Waynesboro, for plaintiff in error.

ERNEST F. SMITH, Assistant Attorney-General, for the State.

MR. JUSTICE NEIL delivered the opinion of the Court.

The plaintiff in error, hereafter referred to as the defendant, was indicted, tried, and convicted of murder in the first degree in the Circuit Court of Wayne County. He was sentenced to serve twenty years and a day in the state penitentiary. He has appealed and assigned a number of errors. It is conceded by counsel that the assignments present only one question, to-wit, Does the

evidence preponderate against the verdict of the jury and in favor of his innocence?

The defendant shot and killed Richard Cook, a young man about seventeen years of age, on a tow boat that was tied to a barge at a river landing near Clifton, in Wayne County. The killing occurred on the night of November 24, 1944, shortly after the termination of a crap game in which the deceased and defendant had participated. There were two boats tied to the barge at the landing at Clifton. The defendant Forsha was pilot on one of the boats and Albert Thompson was pilot on the other boat. Thompson had supper with Forsha upon the latter's boat, after which they went into the town of Clifton together. They were in town about forty-five minutes or an hour and took several drinks of whisky together. While on this trip they met Richard Cook and possibily some others and a crap game was planned on Thompson's boat for that night. According to Thompson, those taking part in the game besides himself were defendant, deceased, and a young man named Kiddy. Ray Jeter was present and possibly some others, but they took no part in the game and were not drinking. The game had not been in progress very long when Forsha got mad because he thought someone had beaten him out of some money. He was reminded that he had his money in his hand, but this did not pacify him. He stated "he would knock hell out of anybody that would say anything to him about it." After the disagreement about the money, the defendant and Richard Cook had some words when defendant said he could whip anybody on the boat, and Richard replied he could not whip him. At this point they went into a clinch and fell to the floor. In the fall the defendant received a skin wound above the eye brow, which bled to some extent. The defendant Forsha asked Cook to let

him up, which he did. Thereupon they immediately embraced each other, saying, "You are the best friend I ever had." The game was carried on for several minutes after this harmless encounter.

It appears that on the day of this crap game and fatal shooting, the defendant had carried an army rifle to his boat. It was an automatic "paratrooper's" gun which had been used by his brother-in-law in the war. The principal State's witness, Albert Thompson, gave the following account of the shooting: After stating that the game ended and peace had been restored, he said, "The defendant said he was going after his gun. Naturally, I did not think he would, but he did, and got the gun and came back. I was fixing to turn out the lights and go upstairs where Richard and Ray Jeter were. Before I stopped the light plant, he came back to the barge, even with the boat, hollering and cursing."

"Q. What did he say? A. He said, where are the God-damned fellows? I said they went upstairs and he said God-damn them, they better stop, and I believe he shot three times. I said, Pete, what are you doing? He said, by God, he didn't mean for them to run off with his money. He said, where is that God-damned Richard Cook, where in the hell is he? Then Richard came down the stairs, and I said Richard, don't go out, there is no use of getting in trouble. He didn't say anything, but Richard pushed me out of his way and said, Here I am, Pete. They walked back in the kitchen and turned on the lights. Pete commenced throwing the shells out of his gun in the floor. Then he commenced trying to pick them up and put them back in his gun. He said he couldn't load it and Ray Jeter started to help him and he said, God-damn you, I don't like you. Then Richard said, I will load it, and he said, All right, Richard, load it,

and he, Cook, inserted the shells into the clip and defendant then placed the clip in the gun at the proper place for firing. And he did and put them back in the gun and he started back to the engine room and he called us in and said, Come in, every God-damned one. He commenced talking about what he would do and what he had done.

"Q. What did he say? A. He said he would shoot any God-damned one of you, he would shoot any one who would make a move. Richard was leaning up against the door and he said, Pete, nobody is mad at you, and you are not mad at anybody. He said, no, I am not mad at anybody, I don't want anybody to run over me. Richard said, nobody is trying to run over you. I said, Pete, nobody is mad at you, and he lowered the gun on me and said shut up. Then Pete said to the deceased, pointing the gun at him, don't you believe I will shoot you? And Richard said, I don't believe you would shoot me. I've done nothing to cause you to shoot me. Then he did, he fired twice.

"Q. Where were you at the time Richard was shot? A. Within one foot of him."

According to Thompson, both the defendant and deceased were "pretty full". Speaking of Forsha, he said, "I did not know he was so full," and up until the shot was fired "there was nothing to indicate that he wanted to do Richard any violence or injury."

Ray Jeter, a witness for the State, testified that when he and Kiddy got to the boat the game was in progress and they were all laughing and seemed to be enjoying themselves. When defendant left to get his gun, he made no threats toward anyone in particular. "He said he would shoot the boat up on the hill and they had better not be there when he got back."

The defendant, testifying in his own behalf, contended that he was not angry at the deceased; that they laughed off their little difficulty and expressed friendship each for the other. He testified that after the game was over, "he told the crowd he was going up to his boat to get a gun he had there." He said he had never shot the gun, that he was not familiar with fire-arms. His reason for having the gun on the boat was to shoot some ducks. He admitted what he called a foolish remark about "shooting up the boat", but said he meant no harm to anyone and had no grudge at anyone and did not intend this as a threat. After he got the gun and was on his way back to the boat, he said he was "handling it and it fired two times", He said he did not know why it fired, that he was not shooting at anyone. When he got near the boat he called Richard Cook, as he wanted to show him the gun. The defendant did not deny pointing the gun at various members of the group, but insisted he was merely pranking with the gun and had no intention of harming anyone. He said "his whiskey was doing the talking, the braggin," etc. After the cartridges fell out and the gun was reloaded with the assistance of Cook, he continued to prank with the gun, pointing it first at one of them and then another, and when he was cautioned he would tell them to "shut up." When he pointed the gun at Cook, the defendant says he "touched something, he knew not what, and the gun fired." He said he did not know why it went off, and "the next thing he knew, it fired again."

The bullet entered the body of the deceased near the left nipple and the second one entered several inches lower, both passing entirely through the body.

The defendant contended that he had no malice or ill will toward any man on the boat and no desire to harm

any of them. Speaking with special reference to the deceased Cook, he said ''he shot and killed the best friend he had, but had no reason for doing so, no desire to do so, and all he did that caused the gun to fire was unintentional.''

The defendant contends under his several assignments of error that the evidence does not support a verdict of murder in the first degree; that the elements of malice, premeditation, and deliberation are wholly lacking; that ''the proof in the cause showed the defendant only guilty of a lower offense than that found by the jury, to-wit, involuntary manslaughter, or at most murder in the second degree.''

The State does not insist, at least, not very vigorously, upon an affirmance of the present judgment, but does contend that the defendant is guilty of murder in the second degree, and that we should follow *Corlew* v. *State,* 181 Tenn. 220, 180 S. W. (2d) 900, and fix the defendant's punishment at the minimum period of imprisonment provided by the statute for murder in the second degree.

██ ██ Upon a full and careful review of the entire record, we are not at all satisfied with the conviction of murder in the first degree. We think there is some material evidence showing malice. First, the defendant thought Cook had short-changed him in the crap game. He was mad about it. Second, he armed himself with a deadly weapon and upon his return to the Thompson boat, was asked, ''Pete, what are you doing?'' and he replied, ''By God, he didn't mean for them to run off with his money.'' He then said, ''Where is that God-damned Richard Cook, where in the hell is he?'' Now it is true, according to Thompson and the defendant, that the two men appeared to be friendly after this threat was made, but the jury evidently believed that a feeling of animosity

still existed toward the deceased Richard Cook. We cannot say that this belief was unfounded. The defendant knew he was handling a deadly weapon and that it was loaded. He further well knew his unfamiliarity with its mechanism. If he had any sense at all he knew it was very dangerous to point it at another person. He was drinking, but admits he knew what he was doing. He was handling this gun wilfully and so recklessly as to indicate a total and criminal disregard for the lives of others. Moreover, malice is always implied from the use of a deadly weapon.

The defendant seeks to escape the penalty of the law by insisting that it was an unintentional killing. The State cites the case of *Mullins* v. *State*, 156 Tenn. 105, 299 S. W. 1052, as authority in support of its contention that the defendant here is guilty of murder in the second degree. We are constrained to agree with this insistence. In the *Mullins Case* the killing followed a dispute in a poker game when the parties were drinking. The defense made was that the killing was unintentional, just as it is made here. Mr. Justice CHAMBLISS, in responding to this contention, quoted with approval a statement of Mr. Justice LURTON in *Tarvers v. State*, 90 Tenn. 485, 16 S. W. 1041, as follows [156 Tenn. 105, 299 S. W. 1055]: "'An unintentional killing constitutes murder in second degree, where the death results from a consciously unlawful act, done intentionally and with knowledge on the part of the perpetrator that the act was directly perilous to human life. There exists, in such case, that high degree of conscious and willful recklessness which evinces the malignity of heart that constitutes malice.'"

Able counsel for the defendant has cited the case of *Robertson* v. *State*, 70 Tenn. 239, 31 Am. Rep. 602, as applicable to the facts in the instant case. There the

Court expressed the view that a conviction for voluntary manslaughter could not be sustained "where the facts set out in the bill of exceptions [left] it doubtful whether the act from which the death resulted was accidental or designed." We do not find ourselves in disagreement with this statement of the law, but feel that it has no application to the facts of the instant case. Under the facts before us, this was not an accidental killing and counsel does not seriously contend that it was accidental. We are in agreement with him that there is some analogy between the case cited and the facts now before us, but, under the rule of law laid down by the Court in *Mullins* v. *State, supra,* it is well nigh impossible to escape the conclusion that the defendant is guilty of at least murder in the second degree.

The assignments of error are overruled. In conformity with the view herein expressed, the Court is pleased to correct the judgment of the trial court so as to fix the term of the defendant's imprisonment in the penitentiary at the minimum provided by law for murder in the second degree.

### On Petition to Rehear.

The plaintiff in error has filed his petition to rehear, with supporting brief, complaining of error committed by the Court in modifying the judgment of the trial court, it being earnestly insisted that the case of *Corlew* v. *State,* 181 Tenn. 220, 180 S. W. (2d) 900, was erroneously applied.

The State has filed an answer in which it is said, "The rule announced in *Corlew* v. *State* is properly applied to the state of facts found to have existed by this Court. The use of a deadly weapon under the state of facts war-

rants the decision of this Court and is sustained by *Mullins* v. *State,* 156 Tenn. 105, 299 S. W. 1052."

The defendant was convicted of murder in the first degree in the Criminal Court of Wayne County and sentenced to the penitentiary for twenty-one years and one day. Upon a full consideration of all the evidence, we expressed our dissatisfaction with the verdict and sentence imposed, but found that he was clearly. guilty of murder in the second degree. The judgment was modified in accordance with this finding and his punishment fixed 'by the Court at ten years in the state penitentiary, which is the minimum punishment for second-degree murder.

The petitioner does not insist that we overrule or even modify *Corlew* v. *State, supra,*' but says, "In criminal cases the jury must find the defendant guilty of every element of any offense beyond a reasonable doubt," and for this reason it was error not to remand the case for a new trial.

The principle upon which the Court rested its opinion in the *Corlew Case* was that where the indictment embraced several offenses of different grades and the accused was convicted of the greater, the jury by its verdict has also convicted him of all lessor offenses.

Upon appeal we not only look to the record to determine if the evidence preponderates in favor of his innocence of the greater crime, but also if it preponderates against the verdict as to the lesser offenses. Under the judgment of conviction he is presumed to be guilty of each and every crime embraced in the indictment.

Now if the evidence preponderates in favor of his innocence of murder in the first degree, as in the instant case, because lacking in the elements of deliberation and premeditation, it becomes our duty to correct this manifest error, which was done by modifying the judgment

and affirming his conviction of murder in the second degree.

In opposition to petitioner's contention that we should reverse and remand for a new trial, the State contends that the conviction of murder in the second degree should be sustained. It is argued that the petitioner has had a fair trial under the Constitution, and the law does not require us to remand for a new trial upon the lesser crimes. We think this position of the State is sound. If the evidence does not preponderate in favor of the petitioner's innocence of murder in the second degree, the State is entitled to have his conviction of that offense affirmed.

We do no violence to any legal right of petitioner because he has had a fair trial "by his peers" and was found guilty. There is no insistence that he did not have such a trial as to his guilt or innocence of all offenses.

The contention made that upon a remand a jury perchance might acquit him of all offenses cannot be given serious consideration. For us to remand this case upon any such hypothesis would be to give recognition to one's right to gamble with the cause of justice to the prejudice of the peace and good order of society. The petitioner admits he is guilty of involuntary manslaughter.

While petitioner's counsel has presented the strongest argument that could be made against the power of appellate courts to modify and reduce punishment in criminal cases, we feel that complete justice has been done the petitioner in applying the rule announced in the *Corlew Case*.

The petition denied.