Owen *v.* State.

(*Jackson*, April Term, 1949.)

Opinion filed June 10, 1949.

Ross & Ross, Savannah, and D. E. Mitchell, Henderson, for plaintiff in error.

J. Malcolm Shull, Assistant Attorney General, for the State.

Mr. Justice Tomlinson delivered the opinion of the Court.

Plaintiff in error, Prince Owen, appeals from a conviction of murder in the second degree of Jarele Marie Tidwell and Mrs. Robert Elvie Hicks whose deaths

resulted from being run into by a truck as they walked along the shoulder of Highway No. 45 in Henderson County between 11:00 and 11:30 on the night of May 10, 1947. The first question made by the assignments of error in support of his appeal is that the evidence preponderates against the verdict.

Jarele Marie Tidwell, an eight year old girl, and Mrs. Hicks, a grown young lady, were two of a party of five of the family and relatives of John Tidwell that attended with him a picture show in Henderson on the night in question. After the show and close to 11:30 P.M. these six started walking north on this highway from Henderson to the home of Tidwell two miles away. They walked single file. While so walking north on the west shoulder of this highway, and at a point about three-fourths of a mile from Henderson between 11:00 and 11:30 P.M., the right wheels of a truck southbound on this highway left the paved surface, entered upon the west shoulder of the road, and hit four of this party. This resulted in the death of the two above mentioned. This truck was not stopped.

The truck which hit these people was a Chevrolet without cab or windshield. Its bed consisted only of a floor with no side railings. Only its left front light was burning at the time. One Bob Plunk owned a truck which exactly fitted that description. Tidwell, an eyewitness (father of the little girl who was killed), had worked on the Plunk truck and says that he knew it by sight, and is positive in his statement that the truck which hit his family was the Plunk truck. It was not a dark night.

It is conceded that the Plunk truck was in the possession and control of defendant Owen at the time; that somewhere between 11:00 and 11:30 P. M. on that night

he left in this truck from a beer hall located on this highway three miles north of Henderson and drove this truck with only its left front light burning south along that highway and past the point where these people were run down, and on to Henderson.

When Owen, driving the Plunk truck, arrived at the outskirts of Henderson around 11:30 P. M. the attention of each of two policemen was attracted to the fact that his truck had partially run a red light and that a beer bottle had just fallen from the truck. They pursued and came up with this truck in a very brief distance. After a short conversation they arrested Owen and his companion named Snyder on a charge of public drunkenness.

Tidwell arrived at the point of this arrest within a few minutes thereafter. The truck which Owen had been driving was there. Tidwell identified it as the truck which had hit his daughter, Jarele, and Mrs. Hicks, and informed the officers as to what had occurred.

The officers then made an examination of this truck, and found four or five blonde hairs two or three inches long on the righthand front corner of its floor. It appeared to be hair from the head of a person. Jarele Marie Tidwell had blonde hair. She had been hit in the head by the bed or corner of the bed of the truck when it ran into this group of pedestrians.

Another of the six persons overrun by the truck came up and saw the truck from which Owen had alighted just before his arrest. He also identified it as the truck which had hit them.

A witness by the name of Lewis at "pretty close to 11:00 P.M." at a point about three miles north of Henderson saw a truck which fitted the description of the Plunk

truck starting to drive towards Henderson on this highway. Lewis had difficulty passing this truck which was driving in the center of the road. As he did so, he says that he saw one of the men in this truck hand a bottle to the other. One of them cried out, so he says, with a vile and insulting epithet "you got by did you?" This witness proceeded ahead of the truck he had just passed on south towards Henderson for considerably more than a mile and there met the Tidwell party of six walking north at a point near the place where they were run down between 11:00 and 11:30 P.M.

Owen and Snyder admit that they had a bottle of beer on the bed of the truck and that it fell off just as they reached Henderson. They deny that it was passed from one to the other as they drove towards Henderson, or that they cursed any one who passed them in a truck.

Owen and Snyder deny that it was the Plunk truck which hit these people. They undertake to explain the blonde hair by testimony that two days prior thereto there had occurred a collision between this truck and a mule. This explanation seems to be of no probative value because—aside from the fact that there is an unmistakable difference in appearance of the blonde hair of a little girl from that of hair in the tail of a mule— there is the further established fact that it was the fender and bumper of the truck, not the corner of its bed, that struck the mule.

Commencing around 5 P. M. before this collision between 11:00 and 11:30, Snyder and defendant Owen visited a number of beer halls and spent all of this interval of time at one or the other of such places. Owen says that he drank four bottles of beer during this time.

Snyder estimates that Owen drank six or seven bottles. Both assert that neither was intoxicated. Snyder says, however, that during the evening he noticed that Owen "was feeling it".

These two boys were at a beer hall called Millers just before they started to Henderson around 11:00 P. M. As they were endeavoring to fix the lights of this truck so that at least one of them would burn, a taxi driver by the name of Petway Plunk came up. He refused their request to help fix the light, saying that he did not know how. He told these boys at that time, according to his testimony, that they "ought not to drive". It was because "I thought they shouldn't be driving". This was around 11:00 P. M. He left them there and came on to a place called the Grill near the corporate limits of Henderson. They came in shortly thereafter, left a message and immediately departed, he says. It appeared to this witness that Owen "had been drinking" but he was calm. It was but a matter of a minute or so thereafter that they were arrested by the officers, as heretofore stated.

Both of the arresting officers testify very positively that Owen was drunk. He was taken to jail and soon fell asleep. When he aroused from this sleep he soon went back to sleep. He explains this by saying that one of the officers had struck him two violent blows on the head after he was placed in jail. The officer says that he struck him one blow while arresting him because he, Owen, fled and resisted arrest when caught after a brief chase. Owen says he fled only because he disliked this officer.

Other than the occupants of the truck, the only eyewitnesses were the persons who were run down by that

truck. They furnish the only testimony in the record as to the actual manner in which the truck was being driven at that time. Mr. Tidwell says that as this truck approached them it drove straight on the paved surface until it reached a point approximately thirty-five feet north of them and then "whipped off" on the west shoulder, knocked these people down, then continued on this shoulder for about the same distance before pulling back onto the paved surface. Pearl Tidwell, the fourteen year old daughter of the witness just mentioned, says that when the truck got close to them it "dived out, run into us, knocked four down and went back on the highway, kept going". James Hicks (the husband of the Mrs. Hicks who was killed) testified that when the truck in its approach got within thirty or forty feet of them it left the pavement, struck these people, then traveled about thirty feet further before re-entering the paved portion. The testimony of some of these witnesses is that the speed of the truck at the time was about fifty miles per hour.

On the morning after this tragedy witness Fletcher went to the point on the highway where the truck hit these people and observed the wheel tracks of this truck on the west shoulder of the highway at that point. He measured from the edge of the paved surface to the outer edge of the track. The distance was thirty-two inches. The witness who made this measurement stated that the truck wheel came off the paved surface onto the shoulder thirty feet north of the point where he found blood, and from there continued on the shoulder for a little more than thirty feet. So the truck wheel observed by this witness traveled on the shoulder of this road a total distance of more than sixty feet.

Highway No. 45 has a paved surface eighteen feet wide. It is a very heavily traveled highway. The brief filed in behalf of Owen says that it is ''the most traveled, if indeed not the heaviest traveled highway in the State''. The shoulder of this highway ranged from four feet to eight feet in width. At the point of the collision it was eight feet. All the evidence without contradiction is that at the point of the collision these pedestrians were walking on this shoulder at a distance of between four and four and one-half feet from the margin of the hard surface. The bed of the truck driven by Owen was seven and one-half feet wide, and was wider than the chassis.

There is no evidence of any pre-existing ill will on the part of Owen to any of the people in the Tidwell party that night. His uncontradicted testimony is that he entertained a good will towards all these persons.

■ Necessarily included in the verdict of the jury is a finding by it that on that occasion Owen was driving this truck on the public highway while under the influence of an intoxicant in violation of Code Section 10827, and in a manner that endangered or was likely to endanger the lives of people, thus violating Code Section 2681; that while so driving on that occasion in violation of these criminal statutes his truck struck and killed Jarele Tidwell and Mrs. Hicks. That finding is abundantly supported in every respect by the evidence.

■ It is contended by Owen that the evidence preponderates against the verdict of murder in the second degree, even though it be conceded that the evidence abundantly supports the finding stated in the immediately preceding paragraph. His position is that there is no evidence of that recklessness, wantonness or de-

pravity necessary to supply the intent of malice, an essential ingredient of murder in the second degree.

There is very substantial evidence that Owen consciously guided this truck off the traveled portion of the highway onto its shoulder in front of these people. Of course, he would not have done this had he not been intoxicated. It might be reasonably surmised that the purpose of his intoxicated mind was merely to frighten these people. However that may be, the manner of his driving straight down the highway until within thirty odd feet of these people, the manner in which he then drove onto that shoulder, though confronted with no emergency, the depth of the penetration of his truck on that shoulder, the manner and distance in which he guided it back upon the paved portion of the highway after it had swept by these people, all this is evidence from which the jury might well have concluded that the act was no mere inadvertence or negligence, but was one done consciously and intentionally.

The conduct of the driver of this truck at the instant just above related is in keeping with the conduct of the driver of the truck which only a few minutes prior thereto had so unjustifiably sought to block the passage of the witness Lewis. It is fairly well established that the offending truck in that instance was the one which minutes later ran into these people.

The conduct of Owen minutes subsequent to the driving of his truck over these people also fairly well establishes it as a fact that his intoxication was not such as to bereft him of a consciousness of that which he was doing. The evidence is that within a matter of minutes after these people had been run over he stopped at a grill on the outskirts of Henderson and left a message.

Though it was apparent then that he "had been drinking", the witness says that he was calm. His attempt to escape the officer a minute or so thereafter was the act of a person who had an understanding of that which was going on around him.

The reckless and wanton conduct of intoxicated Owen while driving this truck over the public highway was immediately and directly dangerous to those walking upon the shoulder of that highway. So, in this situation, and under the evidence in this case, the law supplies the intent of malice. In the perhaps leading case of *Tarvers* v. *State*, 90 Tenn. 485, 496, 16 S. W. 1041, 1044, the rule is thus stated:

"If the act done was an unlawful act, and the doing of it was directly perilous to human life, and so known to the wrongdoer, then there is implied such a high degree of conscious and willful recklessness as to amount to that malignity of heart constituting malice. The result may not have been intended, yet the deliberate and conscious doing of an act, the probable consequence of which was death, amounts to murder at common law."

An unintentional killing under such circumstances is murder in the second degree. *Mullins* v. *State*, 156 Tenn. 105, 114, 299 S. W. 1052.

The case of *State* v. *Trott*, 190 N. C. 674, 130 S. E. 627, 630, 42 A. L. R. 1114, seems to be directly in point here. In that case an automobile while being driven by an intoxicated person at a rapid speed over the main street of a town collided with another car and killed one of its passengers. The Court in sustaining a conviction of murder in the second degree quoted with approval from Huddy as follows:

"The act of a motorist may fall within the cases of murder in such a manner as to evince a depraved mind, as where one voluntarily becomes intoxicated while driving a car, and then drives on the streets of a city at a high rate of speed, heedless to pedestrians or of his acts."

■ Complaint is made with reference to particular instructions given the jury in regard to second-degree murder. That insistence was predicated upon the theory that a verdict of murder in the second degree could not be sustained under the evidence in this case. Hereinbefore, this question has been determined adversely to that contention. This results in the conclusion that the jury instructions in question were correct.

Considering now the final insistence, it is provided by Code Section 11751 that the Judge shall instruct the jury as to all the law of each grade of the offense charged in the indictment, in this case, murder in the first degree. The Trial Judge instructed the jury only as to second degree murder and involuntary manslaughter, and did not charge the law as to voluntary manslaughter. This omission is assigned as reversible error.

■ Voluntary manslaughter is defined by Code Section 10774 as the unlawful killing of another "upon a sudden heat". The heat must be due to provocation of such character as would be resented by an "average reasonable man". *Freddo* v. *State*, 127 Tenn. 376, 382, 155 S. W. 170, 172, 44 L. R. A., N. S., 659.

■ There is no evidence that Owen ran his truck into these two girls while laboring under a heat produced by adequate provocation. He was laboring under no passion, nor was there any provocation whatever. Under any view of the evidence there was none to support a finding of guilt of voluntary manslaughter. Com-

pare *Nelson* v. *State,* 65 Tenn. 418, 421. Should the Court, nevertheless, have charged as to voluntary manslaughter, in view of Code Section 10774, or for any other reason?

In *Stroud* v. *State,* 159 Tenn. 263, 270, 17 S. W. (2d) 899, wherein a similar question arose the Court said that the statutory requirement hereinabove referred to was not applicable to a grade of the offense not supported by any evidence in the case. In *State v. Hargrove,* 81 Tenn. 178, 184, the Trial Judge declined to charge as to voluntary manslaughter because "the facts in the case do not raise that proposition of law". This Court held that this was not reversible error. In *Palmer* v. *State,* 121 Tenn. 465, 488, 118 S. W. 1022, 1028, the error assigned was the failure to charge "upon the subject of assault with intent to commit the specific crime of which the plaintiff in error was convicted". The Court held: "We do not think there was any error in this respect. There was no evidence upon which such a charge could have been based." In *Powers* v. *State,* 117 Tenn. 363, 372, 97 S. W. 815, 817, it was held that the Circuit Judge did not err in failing to instruct as to involuntary manslaughter upon an indictment for an offense which embraced involuntary manslaughter because "there was no evidence that would have justified such a charge".

As heretofore observed, there was no evidence in this case to justify a verdict of voluntary manslaughter. So, upon the authority of the cases mentioned, and others which might be cited, it must be held that the Trial Judge did not commit error in failing to instruct the jury with reference to that offense.

Affirmed.

All concur.