**IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE**

**AT JACKSON**

**MAY SESSION, 1997**

FILED

December 3, 1997

Cecil Crowson, Jr.
Appellate Court Clerk

| | | |
|---|---|---|
| **STATE OF TENNESSEE,** | ) | **C.C.A. NO. 02C01-9603-CR-00095** |
| | ) | |
| Appellee, | ) | |
| | ) | **SHELBY COUNTY** |
| | ) | |
| **V.** | ) | **HON. FRED AXLEY, JUDGE** |
| | ) | |
| **COLLIER V. HARRIS,** | ) | |
| | ) | **(FIRST DEGREE MURDER IN** |
| Appellant. | ) | **THE PERPETRATION OF THEFT)** |

FOR THE APPELLANT:                    FOR THE APPELLEE:

**A. C. WHARTON**                         **JOHN KNOX WALKUP**
District Public Defender              Attorney General & Reporter

**W. MARK WARD**                          **DEBORAH A. TULLIS**
Assistant Public Defender            Assistant Attorney General
147 Jefferson, Suite 900             2nd Floor, Cordell Hull Building
Memphis, TN  38103                    425 Fifth Avenue North
                                      Nashville, TN  37243

                                      **JOHN W. PIEROTTI**
                                      District Attorney General

                                      **EDGAR PETERSON**
                                      Assistant District Attorney General

                                      **LORRAINE CRAIG**
                                      Assistant District Attorney General
                                      201 Poplar Avenue, Ste. 301
                                      Memphis, TN  38103

OPINION FILED _____

AFFIRMED

THOMAS T. WOODALL, JUDGE

# <u>OPINION</u>

The Defendant, Collier V. Harris, appeals as of right from his conviction of first degree murder committed during the perpetration of theft, in violation of Tennessee Code Annotated section 39-13-202(a)(2). The offense occurred on November 29, 1992. Defendant received a sentence of life imprisonment.

Defendant raises the following issues in this appeal:

(1)     The evidence is insufficient to support his conviction for first degree murder committed in the perpetration of theft.

(2)     Extension of the "felony murder" rule to misdemeanor theft violates his rights to due process and equal protection afforded him by the Fourteenth Amendment of the United States Constitution.

(3)     The trial court erred in allowing the State to introduce into evidence proof that the victim, prior to her death, claimed that Defendant had attempted to rape her on the basis that the proof was hearsay, irrelevant, improper proof of other crimes, and the prejudicial effect outweighed any probative value.

(4)     The trial court erred in allowing the State to introduce into evidence proof that the Defendant had raped four other women, as the evidence constituted improper proof of other crimes or bad acts by Defendant.

(5)     The trial court erred by ruling that in the event Defendant testified, the State could introduce impeachment proof by questioning the Defendant regarding the four rapes committed by Defendant, when the Defendant had not yet been convicted of any charges relating to the rapes.

(6)     The trial court erred by declining to grant Appellant's request to instruct the jury more completely on how it was to consider circumstantial evidence.

(7)     The trial court erred by refusing to instruct the jury as to the lesser included or lesser grade offenses of voluntary manslaughter and reckless homicide.

(8)     The trial court erred by instructing the jury that it could consider proof of the other rapes to show Defendant's intent and motive.

(9)     It was error for the prosecutor to be allowed to argue to the jury that it consider evidence of other rapes to show Defendant's propensity to commit the offense of rape.

(10)    The cumulative effect of the errors deprived Defendant of a fair trial.

## 1. SUFFICIENCY OF THE EVIDENCE

When an accused challenges the sufficiency of the convicting evidence, the standard is whether, after reviewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 319 (1979). On appeal, the State is entitled to the strongest legitimate view of the evidence and all inferences therefrom. State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). Because a verdict of guilt removes the presumption of innocence and replaces it with a presumption of guilt, the accused has the burden in this court of illustrating why the evidence is insufficient to support the verdict returned by the trier of fact. State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982); State v. Grace, 493 S.W.2d 474, 476 (Tenn. 1973).

Questions concerning the credibility of witnesses, the weight and value to be given the evidence, as well as all factual issues raised by the evidence, are resolved by the trier of fact, not this court. State v. Pappas, 754 S.W.2d 620, 623 (Tenn. Crim. App.), perm. to appeal denied, id. (Tenn. 1987). Nor may this court reweigh or reevaluate the evidence. Cabbage, 571 S.W.2d at 835. A jury verdict approved by the trial judge accredits the State's witnesses and resolves all conflicts in favor of the State. Grace, 493 S.W.2d at 476.

Several witnesses testified during the State's case-in-chief. Walter Blaydes met the victim, Peggy Sue Birkhead, in June 1991 while she worked as a cashier at Mapco in Millington. As she was a single mother and he helped her care for her five (5) year old son, the two became friends. During the two to three months prior to the victim's death, she and Blaydes began dating. Both the victim and Blaydes knew Defendant; Defendant is a distant cousin to Blaydes and the victim met Defendant while working at Mapco. Approximately two months prior to her death, the victim told Blaydes that Defendant was harassing her and trying to get her to go out with him. Blaydes told Defendant "to back off." Then, five to six weeks prior to her death, the victim told Blaydes that Defendant tried to pull her pants off and rape her.

On November 28, 1992, the victim was celebrating her birthday. Blaydes arrived at her apartment around 7:40 p.m. to take her to Sonny & Cher's, a local bar, to meet some friends. The victim was still dressing when he arrived. While he waited, she told him that she had received her ATM card that day, and he noticed it lying on the table. They left and went to Sonny & Cher's and various other bars, then returned to her home around 12:00 or 12:30 a.m. on November 29, 1992. The victim had previously given Blaydes a key to her apartment, and he used it to unlock the back door. He stayed approximately twenty minutes, during which time they talked and had sex. When Blaydes left, the victim was in bed and he told her he would call the next morning to make sure she got up for work. He exited through the back door and locked it. Blaydes drove home, arriving there at approximately 1:00 a.m. At this time, he was living with Helen Whitley, his girlfriend of many years. Whitley was in bed when he arrived.

When Blaydes woke up at 6:00 a.m., he tried to call the victim but got no answer. He dressed and went to the local Mapco for coffee. Blaydes stayed at Mapco for approximately ten (10) minutes visiting with friends, and then left for the victim's home to make sure she was up for work. On his way, he noticed three (3) patrol cars just down the street. Entering through the back door using his key to unlock it, he noticed that no lights were on. Blaydes saw the victim lying on the floor, with the body partially in the bathroom and partially in a hallway. He checked her nude body for a pulse. After not feeling any pulse and seeing a telephone cord wrapped around her neck, he left and ran down the street to get the police. Blaydes told Officer White, "I think this young lady killed herself." The two returned to the victim's home where Officer White again checked for a pulse. Blaydes looked in her bedroom and noticed that there were no linens on the bed and the mattress was bare. Officer White told him not to touch anything. When the paramedics arrived, they entered through the front door, but Blaydes did not see anyone unlock it. Later that morning, he drove to the police station where he gave a statement. Blaydes was arrested that day for the victim's murder, but charges were eventually dismissed against him.

Pandora Whitley resided across the street from Helen Whitley. On November 28, 1992, Blaydes left Whitley's home to pick up the victim for her birthday party. During the early morning hours of November 29, at approximately 1:00 or 1:30 a.m., Pandora Whitley was up fixing formula for her baby when she heard a car pull up. Through her kitchen window, she saw Blaydes get out of his van and go into Helen Whitley's home.

-5-

Helen Whitley, who had married Blaydes by the time of the trial, testified that she heard Blaydes come home a little after 1:00 a.m. on November 29, 1992. When she left around 4:00 a.m. to go to work, Blaydes was sleeping.

Officer Steven White, patrolman with the Millington Police Department, was on East National Street answering a domestic violence call on November 29, 1992, at approximately 6:30 a.m. As he was coming back out to his car, Blaydes ran up to him saying, "I think this girl done killed herself." Blaydes, whom White knew to be usually calm and quiet, was very excited and shouting. In fact, Blaydes was so upset that he could not give White the victim's apartment number. White followed Blaydes back to the apartment, and Blaydes pointed out where her body was located. White told Blaydes not to touch anything, and then checked for the victim's pulse. The victim had a telephone cord wrapped around her neck and her body and was spattered with blood. White felt no pulse and noticed that her skin was cool. As the body was in a stiffened condition with the blood settling to the lower areas of her body, he believed the victim was dead. White noticed the front door was closed and was surprised when the firemen came through it because he thought it was supposed to be locked. After other police officers arrived, White took Blaydes out to his squad car and later followed him to the police station.

Lieutenant Robert Fredres, a fireman with the Millington Fire Department, was called to 7708 East National on November 29, 1992. He entered through the front door which was not locked. Since the victim was already dead, he was told to leave as his assistance was not necessary.

Sergeant Tabrina Estes, assigned to the Detective Division of the Millington Police Department, was called to the victim's home to investigate a homicide. While there, she photographed the evidence and the apartment. During her investigation, she noted that portions of an ink pen and its spring were stuck to the victim's body. The victim had clothing lying underneath her. She found a knife stained with blood and blood spatters on the wall, along with several items of clothing stained by blood and feces. The victim's telephone was found underneath a wet sheet in the bathroom sink. A bent knife was found underneath the chair in the hallway, and plastic pieces of that knife were found underneath the victim. A bent fork was also found in a brown box in the hallway. She was unable to get any fingerprints from the scene. On the victim's table, she found an envelope for a Money Belt ATM card and a checkbook register, with a balance of $32.16. During further investigation at the First Tennessee Bank, she found a receipt from the ATM booth in the trash for $30.00 withdrawn from the victim's checking account on November 29, 1992. The victim's ATM card was found by an unidentified bank customer in the front lawn at the First Tennessee Bank, and that card was turned over to Sergeant Estes.

Dr. Vilette Hnilica, the medical examiner for Shelby County, performed the autopsy on the victim. Her medical opinion was that the victim died of multiple types of injuries, any one of which could have caused her death. None of the injuries were older than a few hours, and all occurred while the victim was still alive. Dr. Hnilica suspected that strangulation was the first injury and the other injuries occurred later, possibly due to a struggle. She testified that the victim suffered from strangulation with a fracture of the hyoid bone, and such fractures only occur when tremendous manual force compresses underneath the mandible

and cuts off the blood supply to the brain. A hyoid bone fracture and strangulation are "just a part of each other." There were many bruises, abrasions and scrapes around the victim's neck, chin and upper trunk that related to the strangulation effort. There were no ligature marks on the victim's body, indicating that her strangulation was not caused by a hanging. Dr. Hnilica explained that loss of consciousness from strangulation occurs between thirty (30) seconds and four (4) minutes. When this occurs, a person loses her ability to control their bowels and bladder. Evidence of fecal staining was found around the victim's anus, but, as the victim was nude, no evidence of urine staining was found.

The victim's liver was smashed, or actually burst, at four (4) different sites. A massive force with a blunt object was probably applied from either the front or the back to smash the liver. Three (3) pints of free blood was found within the body, indicating the liver had "bled out."

There were twelve (12) individual stab wounds to the victim's body. Two (2) of the stab wounds went straight through the victim's heart. From her examination, Dr. Hnilica determined that all of the stab wounds except for one (1) were caused by a three (3) to four (4) inch knife blade. These stabbings were characteristic of a single-edge blade with the sharp edge being down at the time of the stabbing. One (1) stab wound was different in that it was rounded, possibly caused by a pen. The victim lacked defensive wounds on her hands and forearms, which indicated that she was not actively fighting or defending herself with her hands and that her body was relatively stationary at the time of the stabbings.

There was a large bruise to the victim's sternum area, an apparent blunt force injury caused by something such as a knee, hand, board or brick. Four (4) small puncture injuries were found on the victim's back. These were tiny and round, measuring only one-half (½) inch or less, and resembled the edge of something sharp entering into the skin. She noticed three (3) very specific patterns on the victim's forehead, cheek, and the right side of her chest underneath her breast. Usually those patterned contusions match to some object which caused them, but the autopsy did not reveal what object matched these contusions. During the autopsy, Dr. Hnilica also took a complete sexual assault kit from the victim.

Gail Delancey, manager at First Tennessee Bank, Millington, testified that the victim's ATM card was brought in by a customer who found it outside the bank in the grass. After receiving the card, Delancey found out that it was the card of the "girl who had been murdered." She called the police, and gave the card to Sergeant Estes. While Estes was at the bank investigating, they went through the trash and found an ATM receipt for a withdrawal of $30.00 from the victim's checking account on November 29, 1992. Delancey also gave the police the video from the ATM video camera.

Pat Smith, the manager of electronic banking at the bank, explained the ATM transaction record of the victim's ATM card for November 29, 1997. At 5:07:07 a.m., there was an invalid request to withdraw funds from the victim's savings account in the amount of $36.00. At 5:07:44 a.m., there was a second request from the same account for the amount of $32.00. Smith explained that requests for withdrawals are only valid if in denominations of ten (10). Various

other attempts were made according to the ATM transaction record, until a transaction was completed at 5:09:46 a.m. by a withdrawal from the victim's checking account in the amount of $30.00.

Sheila Bramlitt, the loss prevention officer in the Corporate Security department of First Tennessee Bank, showed the videotape from the ATM booth to officers of the Millington Police Department. Bramlitt noted that the Defendant was the one performing the withdrawal from the victim's account on the tape, and that he was standing to the left of the booth where a person would not normally stand to complete a transaction.

Paulette Sutton, supervisor of the forensic serology lab at the University of Tennessee, received a bed sheet from the victim's home for analysis. It had yellowish-tan stains. Several of the stains tested positive for semen and blood. While none of the stains tested positive for urine, the sheet was wet when it was found, and if the sheet had become saturated enough with water, then the stain might not test positively for urine.

Hoyt Eugene Phillips, a forensic scientist with the Tennessee Bureau of Investigations (hereinafter "TBI"), testified that he is a latent fingerprint examiner. In his examination of the telephone, fork, knives, pen, beer can and envelope, he found a palm print inconsistent with either Blaydes or the Defendant and a shoe print on the envelope for the ATM card.

Linda Littlejohn, also a forensic scientist with the TBI, specializes in shoe track comparisons and trace evidence. Upon examination of the victim's robe,

she determined that the cuts in the fabric were inconsistent with the serrated edges of a knife recovered from the victim's apartment. When Littlejohn tested Defendant's shoes, Nike Air Jordans, they matched the shoe print found on the ATM envelope.

Samera Zavaro, forensic scientist with the TBI and serology specialist, examined the sexual assault kit taken from the victim during the autopsy. While he found the presence of semen in the victim's saliva and vagina, the amount was so small as to make identification impossible. Human blood staining was found on the clippings from the victim's left hand fingernails. Human blood was also found on the telephone, fork and bent knife.

Anne Montgomery, the Associate Director of the Forensics Department for GenTest Laboratories, performed the DNA analysis on the sexual assault kit taken from the victim and the suspect kits taken from Blaydes and the Defendant. Montgomery testified that DNA foreign to the victim was found underneath the victim's fingernails, and that DNA was consistent with the Defendant's and inconsistent with Blaydes. Blaydes could have been the sperm donor for the semen stains found on the victim's sheets, and the victim was the match for the blood stains on the sheet. The frequency of the particular DNA profile which matched the Defendant's DNA is 1 out of 426.

Luetricia Pringle, aunt of the Defendant and a distant cousin of Blaydes, testified that she was called by Defendant on December 7, 1993 to come to the office of the District Attorney General. The Defendant was there on unrelated

charges. When she arrived, the Defendant told her that he was "fixing to sign a confession saying that [he] killed this girl." Ms. Pringle specifically testified that,

> I can remember him [Defendant] saying something about the girl bit his penis. And when she bit his penis, he just went wild and started -- if I remember the stuff he was saying, that he started stabbing her. And he told me something about she stabbed him in his hand. I don't know whether it was the right or the left hand . . . I say -- I can remember saying, 'Collier, why you didn't go to the doctor so you could have something if she stabbed you in your hand?' Or if she bit you, why you didn't go to the doctor so you could have something. He said, I can remember something -- I can't remember exactly what it was about, They got me, or something, so I'm going to go ahead and sign it.

While she could not remember discussing with him what he did with the ATM card at that time, Pringle did talk about it with him later.

Shelley Totherow, former coworker of the victim at Mapco, testified that the victim came into the Mapco early in November 1992 looking tired, upset and not well-groomed. The victim no longer worked at Mapco, but came by to visit Totherow. Totherow stated that the victim always looked well when she went out, but on that day she was wearing no makeup. Also, the victim was wearing baggy clothes, which was not the way she typically dressed. When Totherow asked her if something was wrong, she said that the night before she was out with a group of people and that Defendant was in that group. Defendant apparently had left something at her house, and when the group took her home, the Defendant walked in after her. The victim said that Defendant "had her up against the refrigerator or a wall and was trying to force himself on her." The victim planned to tell Blaydes that Defendant tried to rape her.

Four young women testified as to rapes they were subjected to by the Defendant. Such testimony was submitted for purposes of proving Defendant's

identity, motive, and/or intent. Anglia Phillips, a thirty (30) year old female, lives in Millington and knows the Defendant. On October 11, 1993, she went to the Mapco for a snack. She saw Defendant while at the Mapco, and, as it was raining, she accepted Defendant's offer for a ride home. Defendant instead drove Phillips to an open field, nearly a quarter of a mile from the Mapco. When she asked where Defendant was going, he replied "just ride" and sped up. Phillips testified that it was too fast for her to jump out, and she felt like he "was fixing to do something anyway." When Defendant pulled over at the field, he reached across her and opened her door. Defendant said he was "going to teach these bitches a lesson." When he came around to the passenger's side of the car, he snatched her out and grabbed her by the neck. He began to have sex with her from behind, and then said "I think this condom has bust." She was able to break away from him at that point and run across the street. Phillips explained that his arm was around her neck during the rape and that if she had not let him do what he wanted she probably would have passed out because it was too much pressure.

Angela Arnold, who lived in military base housing in Millington, testified that on November 21, 1993, she saw the Defendant at a friend's home. She already knew the Defendant as a friend of her husband. That evening on her way to her car, the Defendant asked for a ride home. Arnold agreed and let Defendant drive as she had been drinking. On their way, Arnold stated her concern for a friend whose car she noticed was not at home. Defendant said he probably knew where her friend was and would drive her there. Defendant drove to "the tree" in Edmund Orgill Park, but no one was there. The two got out of the car and

listened to the radio. Defendant suddenly tried to kiss Arnold, and she refused. Arnold told him she wanted to go home and tried to open her car door.

Defendant closed the door and then grabbed her around the neck. She blacked out when she could no longer breathe or see. When Arnold awoke from unconsciousness, Defendant was jerking her pants down behind the car while she was on her stomach. When she tried to get away, he grabbed her around her neck. She saw red and black and then slipped back into unconsciousness. When she woke up this time, Defendant had unsnapped her bodysuit and was having intercourse with her. When he finally stopped, he said "You wasn't any good," and told her to put her clothes back on. Arnold dressed and got back in the car. He then poured alcohol on her vagina and made her drink some alcohol. Defendant drove to a store nearby and went inside, but Arnold was in such a state of shock that she could not run or scream for help. When Defendant returned, he drove around and then pulled over in a field of trees. He asked her "if [she] wanted to die." Remembering how he had choked her earlier and fearing that he would choke her to death, she removed her clothes upon his demand. Defendant raped her twice, wearing a condom both times. When Arnold told him she could not do it anymore, he drove her around and then threatened her that "he didn't want to see the cops knocking on his door." When Arnold got home, she told her husband what had happened and he called the police.

Danielle Fisher testified that she resided in Millington on August 11, 1993. On that date, she walked to the military base to see her boyfriend. Returning home that evening, she noticed someone following approximately fifteen (15) feet behind her. She later identified this man as Defendant in a police lineup.

Defendant grabbed her and put his arms around her throat and mouth, then took her behind a house in that neighborhood. When she told him he was choking her, he let go and told her to take off her clothes. She removed the bottom half of her clothes, and Defendant forced her to get on her hands and knees. Defendant raped her from behind, then ejaculated on her buttocks and the ground. Following the rape, he took her to the back of the house and told her to take off the rest of her clothes. He used an outside hose to wet down her shirt and then directed her to wipe herself off. Afterwards, Defendant took her back to the area of the rape and told her to put her clothes in a pile, then to walk back toward the direction from which they had arrived. Defendant vanished and she ran to a house where someone let her call the police.

Sara Johnson lived in Millington on June 14, 1991. She knew Defendant as a friend of a man she was dating. On June 14, she was walking when Defendant came by and asked if she wanted a ride. After she agreed, he went to a store for beer and then drove to Richardson Landing in nearby Tipton County. Defendant pulled over so that they could go to the bathroom. After Johnson finished and was pulling up her pants, Defendant told her "No, pull your pants down." Johnson said she knew Defendant was not joking because of the way he said it and the way he was acting. When she turned to walk away, Defendant came up behind her and put his arms around her neck. Her eyesight started going black and closing in. When she woke up, she was in the back seat with her pants off, lying on her back. Defendant was on top of her having intercourse. When he finished, he got out while she dressed. Johnson thought he would kill her, but she still declined when Defendant demanded more sex. Defendant replied that "[she] knew how mean he could get," and raped her again.

-15-

Defendant drove her back into Millington, saying "You're going to call the cops." Johnson denied that she would go to the police.

The last witness for the State was Marjorie Featherstone, a sergeant in the Detective Bureau of the Shelby County Sheriff's Department. On December 9, 1993, the Defendant asked to speak with her while he was already in custody. Defendant told her that he got into an argument with the victim, she pulled a knife on him and cut his finger. He then took the knife away from her and killed her. He stated that he could not remember how he killed her because it had been so long ago.

The Defendant offered no proof at trial.

Defendant was convicted of first degree murder in the perpetration of a theft. At the time the offense was committed, first degree murder could be committed by a "reckless killing of another committed in the perpetration of, or attempt to perpetrate any first degree murder, arson, rape, robbery, burglary, theft, kidnapping or aircraft piracy." Tenn. Code Ann. § 39-13-202(a)(2)(Supp. 1990) (emphasis added). A person commits theft of property if, with intent to deprive the owner of property, the person "knowingly obtains or exercises control over the property without the owner's effective consent." Tenn. Code Ann. § 39-14-103. In Farmer v. State, 201 Tenn. 107, 296 S.W.2d 879, 883 (1956), the Supreme Court stated that to sustain a conviction for "felony" murder, the murder must have been done in pursuance of the unlawful act and must not be merely collateral to it. The "killing must have had an intimate relation and close connection with the felony and not be separate, distinct, and independent from it." Id. (citations omitted).

The evidence in the record indicates that the victim's ATM card was lying on the kitchen table in the victim's apartment when Blaydes arrived on November 28, 1992. The victim told Blaydes that it had arrived that day in the mail. There is no evidence that the ATM card was removed while Blaydes and the victim were out that evening, nor prior to Blaydes' departure from the victim's apartment around 12:30 a.m. on November 29. From the record, a reasonable trier of fact could find that Defendant entered the victim's apartment early in the morning on November 29 and murdered her, first strangling her until she lost control of her bowels and bladder, then stabbing her twelve (12) times and crushing her liver. Defendant voluntarily admitted killing the victim to two individuals, his aunt and a police officer.

When the victim was found, the ATM card was missing. The ATM card was found in the grass outside a branch of the victim's bank, and a receipt showing a withdrawal of thirty dollars ($30.00) from the victim's checking account was found in a trash can. Defendant's shoe print was found on the envelope containing the ATM card at the victim's apartment, and a videotape shown to the jury identified Defendant as the one using the ATM card to withdraw thirty dollars ($30.00) from the victim's account on November 29, 1992.

While the proof in this regard was largely circumstantial, the jury acted within its prerogative in returning a verdict of guilt. See, e.g., State v. Matthews, 805 S.W.2d 776, 779-80 (Tenn. Crim. App. 1990). A crime may be established by the use of circumstantial evidence. State v. Tharpe, 726 S.W.2d 896, 899-900 (Tenn. 1987). Upon review, this court finds that a rational trier of fact could have concluded that the Defendant killed the victim and did so in furtherance of a theft

on the basis of this circumstantial evidence. Before the money could be withdrawn from the account, the theft of the victim's ATM card, which the victim had lying on a table in her apartment, was necessary. See State v. Williams, C.C.A. No. 02C01-9209-CR-00220, slip op. at 11-12, Shelby County (Tenn. Crim. App., at Jackson, Oct. 12, 1994) (No Rule 11 application filed). The conduct causing the death of the victim must be done in furtherance of the underlying crime and the death must be in consequence of it. Id., *citing* Commonwealth v. Redline, 137 A.2d 472, 476 (1958). The evidence is sufficient to support the conviction beyond a reasonable doubt that Defendant killed the victim during the perpetration of a theft. This issue is without merit.


## 2. CONSTITUTIONALITY OF "MISDEMEANOR MURDER"


Defendant argues that the extension of the "felony" murder rule to his conviction of first degree murder in the perpetration of misdemeanor theft violates the due process and equal protection clauses of the Fourteenth Amendment of the United States Constitution. Our Supreme Court recently upheld the constitutionality of this statute. State v. Walker, 893 S.W.2d 429 (Tenn. 1995). While Defendant challenges the issue on a slightly different basis due to his conviction of first degree murder in the perpetration of a misdemeanor theft, the result is the same. The legislative intent of the statute is to be ascertained from the natural and ordinary meaning of the language used. Carson Creek Vacation Resorts, Inc. v. State, 865 S.W.2d 1, 2 (Tenn. 1993); National Gas Distributors, Inc. v. State, 804 S.W.2d 66 (Tenn. 1991). The language of the statute is such that first degree murder is "[a] reckless killing of another committed in the perpetration of, or attempt to perpetrate any . . . theft . . ." Tenn. Code Ann. § 39-

13-202(a)(2). Defendant asserts that because the amount stolen was only thirty dollars ($30.00), the theft cannot result in a felony murder conviction. The clear and plain meaning of the language in the statute is that a reckless killing committed in the perpetration of _any_ theft is considered first degree murder, regardless of the monetary value of the property which is the subject of the theft. While the term "felony murder" has long been a term used to describe the statute in question, we note that the term "felony murder" does not appear in the current version of the Code. See Tenn. Code Ann. § 39-13-202. This issue is without merit.

### 3. HEARSAY EVIDENCE OF DEFENDANT'S ATTEMPTED RAPE OF VICTIM

Defendant argues the trial court erred in admitting hearsay evidence of victim's claims that Defendant attempted to rape her prior to her murder. Specifically, Defendant argues that the evidence was irrelevant, unduly prejudicial, and the state of mind exception for hearsay was inapplicable.

Blaydes testified that the victim told him the Defendant had been harassing her and, on one occasion, tried to pull her pants off and rape her. Ms. Totherow testified that the victim came by her store in early November 1992 and she looked like she had not slept. When Totherow asked the victim if anything was wrong, the victim told her that Defendant had followed her into her home and pushed her against the wall where he attempted to rape her. On both occasions, Defendant objected on the basis of hearsay. The trial court ruled such testimony admissible under the state of mind exception to the hearsay rule.

Rule 803(3) of the Tennessee Rules of Evidence establishes the "Then Existing Mental, Emotional, or Physical Condition" exception to the hearsay rule:

> A statement of the declarant's then existing state of mind, emotion, sensation, or physical condition . . . but not including a statement of memory or belief to prove the fact remembered or believed unless it relates to the execution, revocation, identification, or terms of declarant's will.

Only the declarant's state of mind may be proven by this hearsay exception. See Advisory Commission Comments to Rule 803(3), Tenn. R. Evid. At trial, the State relied upon the case of State v. Cravens, 764 S.W.2d 754 (Tenn. 1989)(Testimony that victim made statement implicating his death was admissible to show state of mind of victim, his fear and apprehension of death, in view of claim of defendant that victim was aggressor and that homicide was justifiable.). Defendant asserts in his brief that Cravens is not applicable, but, rather, the case of State v. Smith, 868 S.W.2d 561 (Tenn. 1993), cert. denied, 513 U.S. 960 (1994), is controlling. (Harmless error to admit statements of victim's fear of defendant under state of mind hearsay exception as not directly probative on issue of whether defendant committed murder.) In this case, the State sought to prove the Defendant guilty of either premeditated and deliberate first degree murder, first degree murder in the perpetration of rape, or first degree murder in the perpetration of theft. To prove rape, the victim's state of mind as to her fear of Defendant was relevant to the issue of consent. Defense counsel sought to prove through cross-examination that the victim consented to sex and that the door to her apartment was not locked. Evidence of the prior attempted rape was probative to the theory of the State's case-in-chief. Clearly, the statements of the victim to Blaydes and Totherow fall within this hearsay exception.

Nevertheless, given the fact that the jury found the Defendant guilty of murder in the perpetration of a theft rather than in the perpetration of a rape, any error by the trial court in admitting this testimony was harmless. See State v. Howell, No. 03C01-9406-CR-00203, Knox County (Tenn. Crim. App., at Knoxville, Feb. 12, 1996), perm. to appeal denied (Tenn. 1996).

### 4. SPECIFIC ACTS OF MISCONDUCT

Defendant argues the trial court erred in permitting four women to testify regarding rapes committed by the Defendant. The trial court admitted this evidence on the limited basis of the crimes' uniqueness and "substantial identity" to the crime for which Defendant was on trial. Rule 404(b) of the Tennessee Rules of Evidence provides as follows:

> Other Crimes, Wrongs, or Acts - Evidence of other crimes, wrongs or acts is not admissible to prove the character of a person in order to show action in conformity with the character trait. It may, however, be admissible for other purposes. The conditions which must be satisfied before allowing such evidence are:
>
> (1) The court upon request must hold a hearing outside the jury's presence;
>
> (2) The court must determine that a material issue exists other than conduct conforming with the character trait and must upon request state on the record the material issue, the ruling, and the reasons for admitting the evidence; and
>
> (3) The court must exclude the evidence if its probative value is outweighed by the danger of unfair prejudice.

When evidence that defendant committed another crime is offered as proof of his identity as the perpetrator of the crime in question, the *"modus operandi* of the other crime and of the crime on trial must be substantially identical and must be so unique that proof that the defendant committed the other offense fairly

tends to establish that he also committed the offense with which he is charged." Bunch v. State, 605 S.W.2d 227, 230 (Tenn. 1980). "To be relevant and, therefore, admissible, it is not necessary that the other crime be identical in every detail to the offense on trial; it is sufficient if evidence of the other crime supports the inference that the perpetrator of it, shown to be the defendant, is the same person who committed the offense on trial." Id. at 231.

In the case sub judice, the trial court held a hearing outside the presence of the jury and determined that the State was relying on identity as a basis for admissibility. Identity had become an issue during voir dire and opening statements. The trial court also listed motive, intent, and absence of mistake or fact as justification for admissibility. In describing the uniqueness of the rapes, the trial court stated as follows:

> The Defendant got these individuals, these women alone. They happened in the area of our county, the Millington area. He was either a friend or had common friends with all of these victims except one. All of them knew him, as in the Peggy Birkhead matter. The choke-holds, from behind, choking the victims into unconsciousness. And in one occasion, the victim was coming to, finds herself behind her car, he begins to choke her into unconsciousness again. From what the Court's experience is, and from what the Court's heard on the Peggy Birkhead matter, she had come to more than once, I suggest. And also cleaning up the crime scene, as in the crime scene at Peggy Birkhead, as in the victim who was raped in the back yard of the apartments. Enough. There's certainly enough for the Court to allow the prosecution to put these witnesses on.

Not only were there unique characteristics in the *modus operandi* of the rapes, but all four women positively identified the Defendant as the man who had raped them. In addition to the similarities listed by the trial court, all of the women raped were young, between the ages of eighteen (18) and thirty (30), and all of the offenses occurred during the evening hours in an isolated location. The

victims' descriptions of the acts committed by the Defendant were similar, and though there are some differences in the allegations, the similarities outweigh the differences. See State v. McKnight, 900 S.W.2d 36, 52 (Tenn. Crim. App. 1994).

Even if it were error to admit such testimony, any error would be harmless as Defendant was not convicted of first degree murder in the perpetration of rape of the victim. This issue is without merit.

### 5. IMPEACHMENT BY PRIOR BAD ACTS

Defendant argues the trial court erred in ruling that if Defendant were to testify, he could be impeached by evidence that he raped the four women. The trial court based its ruling on Rule 608 of the Tennessee Rules of Evidence. While Defendant argued that the evidence would be irrelevant and prejudicial, the trial court stated:

> Well, it would, but I don't know of any exception to the rule that would prevent it. It falls within the statutory definition. If the State wishes to pursue it, I will allow the State to do it.

The State followed the proper notice procedures to the Defendant and the trial court held a hearing on the conduct's probative value on credibility versus its prejudicial effect. See Tenn. R. Evid. 608(b)(3). However, this evidence was inadmissible as it does not relate to the Defendant's character for truthfulness or untruthfulness. Our court has previously held that specific instances of sexual conduct are not probative of truthfulness or untruthfulness. State v. Ford, 861 S.W.2d 846, 849 (Tenn. Crim. App. 1992); State v. Jackson, 697 S.W.2d 366, 371 (Tenn. Crim. App. 1985). The Advisory Commission Comment to Rule 608 states: "To the extent that State v. Caruthers, 676 S.W.2d 935 (Tenn. 1984), can

be construed as allowing cross-examination about a prior act of rape to impeach, the proposal [rule] would change that result."

Although the trial court's ruling was in error, we find that this error did not unduly prejudice the Defendant. As the four women had already testified regarding the prior acts of rape, the impeachment evidence of these same acts would not have further influenced the jury to the Defendant's detriment. After considering the entire record in the case sub judice, we find this error was harmless. Tenn. R. Crim. P. 52(a).

### 6. JURY INSTRUCTIONS ON CIRCUMSTANTIAL EVIDENCE

Defendant argues the trial court erred in refusing to instruct the jury "more completely" on circumstantial evidence. While such request was refused by the trial judge, the request was never submitted in writing as required by Rule 30 of the Tennessee Rules of Criminal Procedure. Absent a written request, a trial court's refusal to give a special instruction is not error. State v. Mackey, 638 S.W.2d 830, 836 (Tenn. Crim. App. 1982).

Defendant argues that the State's case was proven solely by circumstantial evidence, and that failure to give the instruction was reversible error. The Defendant requested the trial court to charge the jury that before an accused can be convicted of a criminal offense based solely on circumstantial evidence, the "facts and circumstances must . . . exclude every other reasonable hypothesis save the guilt of the defendant." A trial court has a duty to give a complete charge of the law applicable to the facts of the case. State v. Thompson, 519

-24-

S.W.2d 789, 792 (Tenn. 1975). When all the proof is circumstantial, the trial court has a duty to charge the jury as to the law of weighing circumstantial evidence even if such an instruction is not requested. Id. However, when the proof in a case consists of both direct and circumstantial evidence an instruction on the law for weighing solely circumstantial proof must be given only if the defendant requests it. Monts v. State, 214 Tenn. 171, 379 S.W.2d 34, 40 (1964).

The proof in this case consists of both direct and circumstantial evidence. The Defendant's statements to his aunt and a police officer are direct evidence of his guilt. As the proof adduced at trial was both direct and circumstantial, the trial court did not commit reversible error by failing to instruct the jury "more completely" on circumstantial evidence. State v. Teague, 680 S.W.2d 785, 790 (Tenn. 1984), cert. denied, 493 U.S. 874 (1989); Thompson, 519 S.W.2d at 792. This issue has no merit.

7. LESSER GRADES/LESSER INCLUDED OFFENSES

Defendant argues that the trial court erred by failing to instruct the jury on the lesser included/lesser grade offenses of voluntary manslaughter and reckless homicide. The offense for which Defendant was convicted occurred in November 1992. Reckless homicide did not become a criminal offense until 1993. Tenn. Code Ann. § 39-13-215, enacted by Public Acts of 1993, ch. 306, § 2. As such, Defendant could not have been convicted of an offense which did not exist at the time of his criminal conduct. Therefore, there was no error committed by the trial court in refusing to charge the jury regarding reckless homicide.

A trial court is not required to instruct the jury on lesser offenses in circumstances where the evidence in the record would not support a conviction for the lesser offense.  State v. Trusty, 919 S.W.2d 305, 311 (Tenn. 1996); Johnson v. State, 531 S.W.2d 558 (Tenn. 1975); Owen v. State, 188 Tenn. 459, 221 S.W.2d 515 (1949); Powers v. State, 117 Tenn. 363, 97 S.W. 815 (1906).

Voluntary manslaughter is defined as the "intentional or knowing killing of another in a state of passion produced by adequate provocation sufficient to lead a reasonable person to act in an irrational manner." Tenn. Code Ann. § 39-13-211(a)(emphasis added).  As set forth above, the proof in this case showed that the victim was killed in a violent manner.  She was stabbed twelve (12) times, with two (2) of the these wounds through her heart.  She received a blunt trauma injury that literally burst her liver at four (4) sites.  She was also strangled sufficiently to fracture her hyoid bone.

Defendant argues that the proof justified a charge of the lesser grade offense of voluntary manslaughter.  He cites the proof that he had told his aunt that he "just went wild" and started stabbing the victim after she bit his penis.

As a panel of this court has previously stated in reference to voluntary manslaughter, "[t]he resentment must bear a reasonable proportionality to the provocation and not every provocation will reduce killing to manslaughter." State v. Thompson, No. 03C01-9503-CR-00060, slip op. at 6, Cocke County (Tenn. Crim. App., at Knoxville, Dec. 12, 1996)(Rule 11 application denied). In State v. Williams, No. 02C01-9209-CR-00220, Shelby County (Tenn. Crim. App., Jackson, Oct. 12, 1994)(No Rule 11 application filed), the defendant was

-26-

convicted of felony murder of his father, and the offense was committed in the victim's home during the perpetration of a robbery. The victim was stabbed sixteen (16) times. Based upon evidence of a struggle between the defendant and victim, the defendant argued that the trial court erred by failing to instruct the jury on "manslaughter." Noting that the trial court provided instructions on second degree murder and that the victim was stabbed sixteen (16) times, our court held that the proof did not warrant an instruction on either voluntary or involuntary manslaughter. State v. Williams, slip op. at 35.

In the case sub judice, we conclude that the multiple injuries inflicted upon the victim constitute an unreasonably high proportionality to the "provocation" relied upon by Defendant, and as a result, an instruction on voluntary manslaughter was not warranted.

Furthermore, we question as to whether voluntary manslaughter is a lesser grade offense of the charge of murder in the perpetration of theft in this case. It is true that our supreme court has stated that "[v]oluntary manslaughter is a lesser grade of first degree murder under Tennessee statutes." Trusty, 919 S.W.2d at 311. However, the analysis in Trusty was in the context of attempted premeditated and deliberate first degree murder.

Approximately two months after the supreme court's opinion in Trusty was filed, our supreme court filed its opinion in State v. Kimbrough, 924 S.W.2d 888 (Tenn. 1996), where the Court held that the offense of "attempted felony-murder" does not exist in Tennessee. Included in its analysis in Kimbrough, our supreme court noted that "felony murder" differs from other types of murder by holding the

defendant strictly liable <u>even</u> when the killing is unintended. The court further quoted from 2 Charles E. Torcia, Wharton's Criminal Law § 147 at 300-01 (15th ed. 1994) that "felony-murder" involves "an intended felony and an unintended homicide." <u>Id</u>. at 890.

Voluntary manslaughter requires proof of an intentional or knowing killing. Tenn. Code Ann. § 39-13-211(a). At the time of Defendant's offense, the gravamen of the offense of first degree murder committed in the perpetration of theft was an intent to commit theft and a <u>reckless</u> killing during the perpetration of the theft. The Tennessee Supreme Court concluded in <u>Kimbrough</u> that the offense of "attempted felony murder" does not exist in Tennessee because an "attempt" is an <u>intentional</u> act and "one cannot intend to accomplish the unintended ["felony murder"]." <u>Id</u>. at 892. In light of <u>Kimbrough</u>, we are constrained to conclude that under the particular facts of this case, voluntary manslaughter is not a <u>lesser</u> <u>grade</u> of murder in the perpetration of a theft.

Also as voluntary manslaughter requires proof of an intentional or knowing killing in a state of <u>passion</u> caused by <u>adequate</u> <u>provocation</u> (elements not included within the crime of murder in the perpetration of theft), neither can it be a lesser <u>included</u> offense of murder. See <u>Trusty</u> 919 S.W.2d at 311.

Therefore, this issue is without merit.

8. MOTIVE AND INTENT

-28-

Defendant argues that the trial court erred in instructing the jury that it could consider "crimes other than that for which [Defendant] is on trial" as evidence to prove Defendant's "motive and intent." The "other crimes" evidence consisted of the testimony of four women who each claimed the Defendant raped and strangled them. The instruction the judge gave was as follows:

> If from the proof you find the defendant has committed crimes other than that for which he is on trial, you may not consider such evidence to prove his disposition to commit such a crime as that on trial.
>
> This evidence may only be considered by you for the limited purpose of determining whether it proves: 1) the defendant's identity; that is, such evidence may be considered by you if it tends to establish the defendant's identity in the case on trial; 2) motive; that is, such evidence may be considered by you if it tends to show a motive of the defendant for the commission of the offense presently charged; 3) the defendant's intent; that is, such evidence may be considered by you, if it tends to establish that the defendant actually intended to commit the crime with which he is presently charged.
>
> Some evidence of other crimes, if considered by you for any purpose, must not be considered for any purpose other than that specifically stated.

Defendant admits that no objection was made at trial regarding this jury instruction and that the issue was not raised in his motion for a new trial. This issue is, therefore, waived pursuant to Rule 3 of the Tennessee Rules of Appellate Procedure. Notwithstanding his failure to address this issue prior to this time, Defendant asserts the charging of the jury with this instruction rises to the level of plain error.

While appellate courts generally do not consider issues not raised at the trial court level, if an error affects the "substantial rights of an accused," then it may be noticed at any time if "necessary to do substantial justice." Tenn. R. Crim. Pro. 52(b); State v. Ogle, 666 S.W.2d 58, 60 (Tenn. 1984); State v. Butler,

795 S.W.2d 680, 683 (Tenn. Crim. App. 1990). For a "substantial right" to have been affected, the error must have prejudiced the appellant; in other words, it must have affected the outcome of the trial court proceedings. United States v. Olano, 507 U.S. 725 (1993). The Defendant bears the burden of persuasion, and this burden has not been met. Even if the trial court erred in charging the jury as to the Defendant's motive, identity and intent, he was not convicted of murder in the perpetration of rape. If any error was committed, it was harmless beyond a reasonable doubt. This issue is without merit.

## 9. PROSECUTOR'S ARGUMENT

Defendant argues that the trial court erred by allowing the prosecutor to state in his closing argument to the jury that it was to consider evidence of the other rapes to show Defendant's propensity to commit the offense of rape. In Harrington v. State, 215 Tenn. 338, 385 S.W.2d 758 (1965), the test to be applied by an appellate court in reviewing instances of improper conduct was set forth by our supreme court. The question is "whether the improper conduct could have affected the verdict to the prejudice of the defendant." Id. at 340, 385 S.W.2d at 759. In Judge v. State, 539 S.W.2d 340 (Tenn. Crim. App. 1976), this Court noted five factors generally accepted as those to be considered when making the determination of whether improper conduct affected the verdict to the defendant's prejudice. Those factors are as follows:

1. the conduct complained of viewed in context and in light of the facts and circumstances of the case;
2. the curative measures undertaken by the trial court and the prosecution;
3. the intent of the prosecutor in making the improper statement;
4. the cumulative effect of the improper conduct and any other errors in the record; and,

5.    the relative strength or weakness of the case.

Id. at 344.

> The prosecutor's remarks to which the Defendant objects to are as follows:
>
> And now you heard from several women today, Angela Arnold, Anglia Phillips, Danielle Fisher, Sara Johnson, and the Judge is going to instruct you as to what you can use their testimony for. And I believe that one of those things that you will be allowed to use that for is motive and intent. What was his motive for coming in there? What was his intent for coming in there? You can also use it for identity. And it was to rape her.

Defendant argues that the prosecutor's comments about the Defendant's motive and intent are nothing more than an argument that Defendant had a propensity to commit other crimes if he had committed the prior crimes of rape. No objection was made at trial regarding these comments by the prosecutor, so this issue is waived pursuant to Rule 3 of the Tennessee Rules of Appellate Procedure.

Notwithstanding the waiver, a review of the merits of this issue does not show any prejudice to Defendant, in light of facts and circumstances of the case. Defendant was convicted of murder in the perpetration of theft, and not murder in the perpetration of rape. The jury chose not to convict the Defendant of murder in the perpetration of rape regardless of the prosecutor's arguments. Prior to making the statements regarding motive and intent, the prosecutor told the jury that the judge would instruct them as to the limited nature of the four women's testimony, thus the argument is not shown to have been made in bad faith. The judge did later instruct the jury, as discussed in Defendant's issue number eight (8), that the evidence of the other rapes was only to be considered for the limited purpose of determining whether it proved Defendant's motive, intent, or identity. In the absence of proof to the contrary, we must presume that the jury followed the trial court's instruction. See State v. Compton, 642 S.W.2d

745, 746 (Tenn. Crim. App. 1982); <u>Frazier v. State</u>, 566 S.W.2d 545, 551 (Tenn. Crim. App. 1977) (citations omitted).  This issue is without merit.

## 10.  CUMULATIVE ERRORS

The Defendant argues that the cumulative effect of the errors deprived him of a fair trial and justifies a new trial.  The Defendant cites <u>People v. Allen</u>, 420 N.W.2d 499 (Mich. 1988), as authority.  Upon review of <u>Allen</u>, we do not find this case as binding authority in Tennessee.  This court found only one error in relation to the trial court's ruling on impeachment of the Defendant by prior bad acts, and  ruled the error was harmless.  Any holding that an error is harmless necessarily contemplates that an analysis of the cumulative effect of harmless errors has been made.  <u>State v. Ralph Parton</u>, No. 117, slip op. at 8, Sevier County (Tenn. Crim. App., at Knoxville, Apr. 10, 1991)(Rule 11 application denied, Sept. 23, 1991).  Thus there is not such an accumulation of errors in this case capable of having deprived Defendant of a fair trial.  <u>Id</u>.  This issue is without merit.

We affirm the judgment of the trial court.

_____
THOMAS T. WOODALL, Judge

CONCUR:

_____
GARY R. WADE, Judge

_____

JOHN H. PEAY, Judge